Clint D. KNIX, Appellant,

v.

STATE of Alaska, Appellee.

Connie J. KNIX, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–5621, A–5634.

Court of Appeals of Alaska.

Aug. 2, 1996.

Rehearing Denied Aug. 27, 1996.

Paul E. Malin, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant No. A-5621.

Leslie A. Hiebert, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, for Appellant No. A-5634.

Elizabeth Vazquez, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

915

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Codefendants Clint D. and Connie J. Knix appeal their convictions of perjury, AS 11.56.200(a), engaging in a scheme to defraud, AS 11.46.600(a)(2), and second-degree theft, AS 11.46.180(a) and AS 11.16.110(2)(B), raising various constitutional claims and statutory construction questions. We affirm the perjury and scheme to defraud convictions but hold that the theft convictions merge with the convictions for scheme to defraud.

Clint and Connie Knix applied for and received public assistance from the State of Alaska, Division of Public Assistance (DPA), from October 1991 through October 1992. From October 1991 through April 1992, the Knixes declared no income. Early in 1992, DPA received an allegation of welfare fraud, which indicated that the Knixes were earning income through a business venture called "Scrumptious Sourdough." On May 21, 1992, DPA employee Guy Swafford interviewed the Knixes concerning their business. During the interview, Clint Knix acknowledged that the Knixes had previously done business under the name Scrumptious Sourdough, but he told Swafford that the business had made no sales and had earned no income since September of 1991.

At Swafford's request, Clint Knix wrote out a statement declaring that the Knixes had received no income from their business venture from September 1991 through May 1992. Beneath this declaration, Swafford wrote, "UNDER PENALTY OF PERJURY, THIS IS A TRUE AND ACCURATE STATEMENT." Both Knixes signed and dated the statement. Swafford, a notary public, then added his own signature and affixed his notary seal.

Subsequent DPA investigation established that the Knixes had in fact obtained substantial income, both from their business and from other sources, while they were receiving public assistance. For fraudulently claiming and obtaining welfare benefits, the Knixes were charged with engaging in a scheme to defraud and theft in the second degree; for submitting the false sworn statement denying income, they were charged with perjury.[1] Following a joint jury trial presided over by Acting Superior Court Judge Sigurd E. Murphy, the Knixes were convicted of all charges.

On appeal, the Knixes first argue that the evidence at trial was insufficient to support their convictions for perjury. The Knixes specifically argue that the state failed to prove that their May 21, 1992, statement to Swafford qualified as a "sworn statement" for the purposes of the perjury statute.

Under AS 11.56.200(a), "[a] person commits the crime of perjury if the person makes a false sworn statement which the person does not believe to be true." Alaska Statutes 11.56.240(2) defines two forms of "sworn statement." For present purposes, we need consider only the form of sworn statement defined in subparagraph (2)(A) of the statute: "a statement knowingly given under oath or affirmation attesting to the truth of what is stated, including a notarized statement[.]"[2]

By its own terms, subparagraph (2)(A) requires this form of sworn statement to be given under oath or affirmation. Under AS 09.63.010, oaths or affirmations may be taken by justices, judges, and magistrates, by clerks of court or their deputies, or by notaries, postmasters, and commissioned officers

1. Clint Knix was individually charged with and convicted of an additional count of perjury as a result of a false sworn statement he made on October 16, 1992. The circumstances surrounding this offense are not at issue here, and Knix does not dispute the sufficiency of the evidence to support his conviction on the separate perjury count.

2. The second form of "sworn statement," defined in AS 11.56.240(2)(B), permits a perjury charge to be established without proof of an oath or

affirmation when a statement is made "under penalty of perjury" by a person who certifies, in accordance with AS 09.63.020(a), that "a notary public or other official empowered to administer oaths is unavailable[.]" Since we conclude that sufficient evidence existed to prove that the Knixes' statement was given under oath or affirmation, and so qualified as a "sworn statement" under AS 11.56.240(2)(A), we need not decide whether it also qualified as a sworn statement under AS 11.56.240(2)(B).

and municipal clerks in certain circumstances. Under AS 09.63.030(a), any officer authorized to administer an oath may notarize a document by certifying "on the document that it was signed and sworn to or affirmed before the officer."[3]

The Knixes point out that DPA employee Guy Swafford testified at trial that he never actually administered an oath or affirmation to the Knixes; and although Swafford affixed his notary seal and signature to the Knixes' statement, he did not certify on the statement "that it was signed and sworn to or affirmed before [him]," as required under AS 09.63.030(a). Given Swafford's failure to administer an oath or affirmation and his failure to include a proper certification, the Knixes insist that their signed statement to Swafford cannot properly be considered a sworn statement as defined in AS 11.56.240(2)(A).

However, in *Gargan v. State*, 805 P.2d 998 (Alaska App.1991), we considered an argument similar to the one advanced by the Knixes. Relying on the Alaska Supreme Court's opinion in *Anchorage Sand and Gravel Co. v. Wooldridge*, 619 P.2d 1014 (Alaska 1980), we observed that, for purposes of determining whether a signed declaration qualifies as a sworn statement, the crucial issue is not whether an oath was actually given, but whether the signed declaration amounts to "a verification on its face of the truthfulness of the facts contained therein."

*Gargan*, 805 P.2d at 1005. We concluded: "When the notary is present at the signing of a document which purports to be sworn, and when the notary then notarizes the document, the requirements of the oath have been satisfied; the document qualifies as a sworn statement." *Id.*

The Knixes nevertheless say that *Gargan* is distinguishable.[4] They point out that, unlike *Gargan*, the signed statement in this case does not certify on its face that the Knixes were under oath and does not otherwise "purport[ ] to be sworn." *Id.* at 1005. For these reasons, according to the Knixes, their statement to Swafford cannot be construed as "a verification on its face of the truthfulness of the facts contained therein." *Id.*

We disagree. As we have previously pointed out, a sworn statement can be made under either "oath or affirmation attesting to the truth of what is stated[.]" AS 11.56.240(2)(A). Although the Knixes' statement does not on its face purport to have been given under oath, it clearly does purport to have been given under affirmation. "An 'affirmation' is a statement by which a person signifies that he is bound in conscience to act truthfully. No particular form of oath or affirmation is required by Alaska law[.]" *Anchorage Sand and Gravel Co.*, 619 P.2d at 1016.[5] On its face, the written statement given to Swafford by the Knixes de-

---

**3.** AS 09.63.030(a) provides:

> (a) When a document is required by law to be notarized, the person who executes the document shall sign and swear to or affirm it before an officer authorized by law to take the person's oath or affirmation and the officer shall certify on the document that it was signed and sworn to or affirmed before the officer.

Subsection (b) of the same statute prescribes a generic form of certification that "may be" used by any officer who notarizes a document; subsection (c), which deals specifically with notaries (as opposed to other types of authorized officers), spells out the manner in which a notary must sign the document and affix the notary seal.

**4.** The Knixes also claim that *Gargan* is not binding because our opinion alternatively concluded that Gargan's conviction could be sustained even if the disputed statement in that case did not qualify as a "sworn statement." *See Gargan*, 805 P.2d at 1005 n. 2. Although technically correct

in characterizing our conclusion on the issue of the sworn statement in *Gargan* as *dictum* rather than holding, the Knixes set forth no persuasive argument suggesting that *Gargan* was incorrectly reasoned and no cogent justification for disregarding that decision. Under the circumstances, the distinction between holding and *dictum* becomes inconsequential.

**5.** *See also United States v. Thai*, 29 F.3d 785, 812 (2nd Cir.1994) ("An affirmation is simply a solemn undertaking to tell the truth; no special verbal formula is required."); *State v. Zamorsky*, 159 N.J.Super. 273, 387 A.2d 1227, 1232 (App. Div.1978) ("The remaining step was to obtain from [the witness] ... a solemn commitment that she would speak the truth. This is the substance of an oath, or of an affirmation or declaration, all of which are forms of attestation by which a witness signifies that [he or she] is bound in conscience to perform an act faithfully and truthfully[.]").

clared that, "under penalty of perjury, this is a true and accurate statement." By virtue of this language, the Knixes plainly "signifie[d] that [they were] bound in conscience to act truthfully." *Id.* This readily qualifies as an affirmation, and its presence on the face of the notarized statement renders the statement one that "purports to be sworn." *Gargan*, 805 P.2d at 1005.

■ Although Swafford did not expressly "certify on the [face of the statement] that it was signed and sworn to or affirmed before [him,]" AS 09.63.030(a), the inference that it was so affirmed flows logically from the presence of the affirmation itself, coupled with Swafford's signature seal of office. Alaska's perjury statute specifically provides that "it is not a defense [to a charge of perjury] that ... the oath or affirmation was taken or administered in an irregular manner." AS 11.56.200(b)(2). To the extent that Swafford's certification failed to comply with the formal statutory requirements governing certification of notarized documents, the deficiency falls squarely within the realm of this provision.

Cases from other jurisdictions support this conclusion. The required certification for an affidavit, traditionally called a jurat, is typically regarded as "merely a certificate of the due administration of the oath. Its purpose is to evidence the fact that the affidavit was duly sworn to before an officer authorized to administer it." *Craig v. State,* 232 Ind. 293, 112 N.E.2d 296, 297 (1953); *see also Cintuc, Inc. v. Kozubowski,* 230 Ill.App.3d 969, 172 Ill.Dec. 822, 825, 596 N.E.2d 101, 104 (1992) (holding that the jurat is not the affidavit, but simply evidence of a properly sworn affidavit).

Errors or omissions in the jurat ordinarily will not render void an otherwise valid affidavit. *See, e.g., American Home Life Ins. Co. v. Heide,* 199 Kan. 652, 433 P.2d 454, 458 (1967) ("If a declaration has in fact been made under oath, it is an affidavit although no jurat be attached.") (quoting *James v. Logan,* 82 Kan. 285, 108 P. 81 (1910)); *Land Clearance for Redevelopment Auth. of St. Louis v. Zitko,* 386 S.W.2d 69, 78 (Mo.1964) ("the omission of a jurat will not render a properly executed affidavit a nullity"); *King*

*v. State,* 167 Tex.Crim. 440, 320 S.W.2d 677, 678 (App.1959) ("When a jurat on its face is defective, the fact that it was properly sworn to may be shown by other evidence.") (citing *Stanzel v. State,* 112 Tex.Crim. 628, 18 S.W.2d 158, 160 (App.1929)).

The principal exception involves situations in which the jurat is blank and the affidavit lacks both the notary's signature and the official notary seal. In such cases, some courts have been unwilling to allow extrinsic proof that the affidavit was in fact executed in the presence of a notary. *State v. Phippen,* 244 N.W.2d 574 (Iowa 1976); *Miller v. Palo Alto Bd. of Supervisors,* 248 Iowa 1132, 84 N.W.2d 38 (1957).

In short, the superior court properly concluded that sufficient evidence was presented at trial to allow the jury to find that the written statement signed by the Knixes in Swafford's presence on May 21, 1992, amounted to perjury: a "false sworn statement which [the Knixes did] not believe to be true." AS 11.56.200(a).

■ The Knixes next assert that the trial court did not properly elicit from them an on-record waiver of their right to testify, as required under *LaVigne v. State,* 812 P.2d 217 (Alaska 1991). This claim lacks merit.

Prior to the conclusion of the Knixes' trial, Judge Murphy conducted a painstakingly thorough on-record inquiry to determine whether the Knixes wished to exercise their right to testify at trial. During the inquiry, the Knixes made veiled, conclusory references to threats that had purportedly been made to them in connection with their contemplated exercise of the right to testify. However, despite repeated efforts by the trial court to delve into the nature of and circumstances surrounding the alleged threats, despite a break in proceedings to allow the Knixes to consult with their attorneys, and despite repeated assurances by Judge Murphy that the court stood ready to hear further information and to take appropriate curative action, the Knixes steadfastly refused to substantiate their vague claim of threats or to divulge any further information explaining their situation.

In response to questioning by Judge Murphy, each of the Knixes' trial attorneys denied threatening their clients, professed ignorance of any actual threats, and assured Judge Murphy that the Knixes had been thoroughly apprised of their right to testify. But defense counsel, too, spoke only in general terms: apparently seeking to avoid a violation of the attorney-client privilege, counsel declined to provide the court with any significant detail or to shed meaningful light on the situation.

Upon completion of the inquiry by Judge Murphy, neither the Knixes nor their attorneys requested any action or relief from the court. The case proceeded, and neither Knix testified. In spite of Judge Murphy's midtrial offer of a post-trial inquiry into the alleged threats, neither the Knixes nor their trial attorneys ever requested a post-trial hearing. Now, however, the Knixes complain that they were coerced into remaining off the stand and that their waiver of the right to testify was involuntary.

The right to testify is undeniably one of the most fundamental rights constitutionally secured to a person accused of committing a crime. For this reason, the Alaska Supreme Court stated in *LaVigne* that, before allowing a criminal trial to conclude without the defendant taking the stand, the trial court must carefully explain the defendant's right to testify, ascertain that the defendant understands that the decision to exercise the right rests with the defendant, and elicit a voluntary waiver of the right.[6]

**6.** The Knixes argue that *LaVigne* requires a knowing and voluntary on-record waiver of the right to testify. The state reads *LaVigne* as requiring something less: an on-record inquiry to ensure that the defendant understands that the right to testify is personal to the defendant and cannot be usurped by the defendant's counsel. *LaVigne* itself is ambiguous on this score. Although the *LaVigne* court appears to have been primarily concerned with the personal nature of the right to testify and the danger of that right being waived by counsel, the closing paragraph of the decision advises:

> To avoid future cases such as LaVigne's, we believe that trial judges should take steps to insure that a criminal defendant's failure to take the stand in his or her own defense was the result of a knowing and voluntary decision made by the defendant. To accomplish this, we believe judges should make an on-the-record inquiry after the close of the defendant's case, although out of the jury's hearing, into whether a nontestifying defendant understands and voluntarily waives his right. Such action insures a valid waiver of the defendant's right.

*LaVigne*, 812 P.2d at 222. This passage ostensibly indicates that the supreme court meant to require that the record in all cases reflect a personal, knowing, and voluntary waiver of the right to testify by the defendant. However, if read to require a knowing and voluntary on-record waiver of the right to testify, *LaVigne* becomes conceptually troublesome. Most constitutionally guaranteed procedural rights stand alone, without any constitutionally guaranteed equal-but-opposite corollary. For example, a criminal defendant enjoys the right to be tried by a jury but has no opposing constitutional right to be tried before a judge alone, without a jury. In the absence of a clear waiver of the right to a trial by jury, the right may be preserved by ordering the defendant to stand trial before a jury; the order will encroach on no other basic procedural rights.

A notable exception is the constitutionally protected right to counsel, whose corollary is the constitutionally protected right to self-representation. *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Within this corollary pair, however, the right to counsel is clearly dominant, and right to self-representation is clearly subordinate. A criminal defendant who does not affirmatively and expressly waive the right to counsel must proceed with legal representation. But while forfeiture of the right to counsel is not tolerated, forfeiture of the right of self-representation is the established norm: the right is commonly ignored unless a defendant affirmatively asserts it, and even then, the trial court must attempt to discourage the defendant from proceeding without counsel and must ensure that the defendant is minimally qualified to pursue a course of self-representation.

The right to testify and its corollary, the right to silence, stand on unique footing. Both are fundamental and constitutionally enshrined. Neither has been established as clearly dominant over the other; they are equally vital. Yet one right is essentially active, while the other is passive: exercise of the right to testify requires the defendant's active participation; the right to silence can be asserted by complete inaction. And the two rights are mutually exclusive. A defendant cannot simultaneously exercise the right to testify and to remain silent. The exercise of one right necessarily entails a relinquishment of the other.

Given the unique nature and relationship of these corollary rights, a rule actually requiring an on-record, voluntary waiver of the right to testify leads to a profound conundrum: what is to be done in the case of a defendant who is unwilling to knowingly and voluntarily relinquish either the right to testify or the right to remain silent? There is seemingly no default option. If a defendant stands mute in the face of a *LaVigne*

A trial judge faced with a defendant who, in the course of this process, voices fears of reprisal as a consequence of testifying—even vague and insubstantial fears—must do everything realistically possible to delve into the issue and elicit an informed, voluntary choice. To this end, the judge should invite a full disclosure by the defendant and the defendant's counsel of any purported threat, offer to invoke the full weight of the court's protective powers against the source of any threat, and conduct a thorough inquiry in response to any information disclosed. The judge should also ensure that the defendant has been provided an adequate opportunity to consult with counsel concerning any potential threats or pressure and should take appropriate measures in the event that an active conflict of interest between client and attorney comes to light.

In the Knixes' case, Judge Murphy did all of the foregoing, but to no avail. When the judge received no response to his efforts, there was little else he could do. The inescapable corollary of the fundamental right to testify is the equally fundamental right to silence. Faced with the Knixes' persistent refusal to elaborate on their situation, Judge Murphy confronted a practical dilemma. On the one hand, the judge could hardly order the unwilling Knixes to take the stand and testify in their own defense. On the other hand, with nothing more than an unsubstantiated hint of threats and repeated assurances by the Knixes and their counsel that no further information was forthcoming, the judge could hardly stop the trial in midstream. As a practical and legal matter, Judge Murphy was powerless to do anything but what he did: require the Knixes to choose among their clearly explained options and to live with the consequences of their choices.[7]

At this late date, still lacking any colorable evidence to substantiate their claim of threat or any explanation for their failure to air that claim before the trial court in a timely manner, the Knixes cannot be heard to complain that their election to remain silent was coerced. The Knixes' skeletal assertion of a threat cannot sustain their challenge to the voluntariness of their waiver. The record currently before us supports only one conclusion: that both Clint and Connie Knix knowingly, intelligently, and voluntarily declined to take the stand. We find no *LaVigne* violation.[8]

---

inquiry or expresses continuing confusion over the court's explanation of procedural rights, a finding of voluntary waiver of the right to testify might strain law and logic. Yet the trial court cannot direct the defendant to testify; nor would it be a palatable alternative to abort the trial—a measure that would put the power of mistrial in the hands of virtually any enterprising defendant. More difficult still would be a defendant who actively professed a desire to testify yet steadfastly refused to waive the right to silence, offering convincing evidence of third-party threats or other coercive forces. A finding of voluntary waiver of the right to testify would be difficult to justify in these circumstances, but would the existence of coercive forces over which the court has no control actually require that the prosecution be abandoned?

In the present case, we assume that *LaVigne* does require a knowing and voluntary waiver, and we conclude that the record establishes that the Knixes did knowingly and voluntarily relinquish their right to testify. We thus avoid the hypothetical problems illustrated above. These hypotheticals, however, counsel against a hasty conclusion that *LaVigne* should be construed to hold that knowing and voluntary on-record waiver of the right to testify will always be required when a criminal defendant declines to testify.

7. The Knixes suggest on appeal that Judge Murphy might have conducted *in camera* proceedings in the absence of their attorneys or ordered independent counsel appointed for the limited purpose of consulting with them concerning the exercise of their right to testify. These measures were neither suggested nor requested below. Conducting *in camera* proceedings in the absence of counsel or appointing special consultative counsel would inevitably have intruded upon the existing relationship between the Knixes and their trial counsel. Measures of this kind could be justified, if at all, only upon a substantial showing of necessity. Nothing in the record indicates the existence at trial of a potential conflict between the Knixes and their attorneys warranting interference with the Knixes' established attorney-client relationships. And nothing suggests that either of the Knixes would have been more forthcoming *in camera* than they were in the courtroom.

8. Moreover, even assuming the Knixes had established a *LaVigne* violation, the error would be harmless beyond a reasonable doubt. To make a threshold showing of prejudice stemming from denial of the right to testify, the Knixes were required to show that they would have offered relevant testimony if allowed to testify at trial. *LaVigne*, 812 P.2d at 221. To date, the Knixes

The Knixes next argue that the trial court erred in instructing the jury on the culpable mental state required for conviction of the offense of scheme to defraud. The trial court instructed the jury, in relevant part, that to prove the crime of scheme to defraud, the state was required to establish that the Knixes "knowingly engaged in conduct constituting a scheme" and "that the scheme was to defraud one or more persons of $10,000[.]" The Knixes now complain that the court should have instructed the jury that the state was required to prove not just that the Knixes knowingly participated in a scheme, but that they did so with specific intent to defraud their victims.

■ Because the Knixes failed to object below to the elements of the offense instruction for scheme to defraud, we review their claim only for plain error. *Hilbish v. State,* 891 P.2d 841, 850 (Alaska App.1995). A plain error is one that is both obvious and obviously prejudicial. *Id.; see also S.R.D. v. State,* 820 P.2d 1088, 1095 (Alaska App.1991) ("A plain error is an obvious one that results in substantial prejudice."); *Reischman v. State,* 746 P.2d 912, 915 (Alaska App.1987) ("In order to establish plain error, the appellant must show that the error was obvious and substantially prejudicial.").

■ Alaska's scheme to defraud statute, AS 11.46.600, does not specify a culpable mental state:

(a) A person commits the crime of scheme to defraud if the person engages in conduct constituting a scheme

(1) to defraud five or more persons or to obtain property or services from five or more persons by false or fraudulent pretense, representation, or promise and obtains property or services in accordance with the scheme; or

(2) to defraud one or more persons of $10,000 or to obtain $10,000 or more from one or more persons by false or fraudulent pretense, representation, or promise and obtains property or services in accordance with the scheme.

The state argues that in the absence of an explicitly designated culpable mental state, AS 11.81.610(b) controls the statute's interpretation. According to AS 11.81.610(b), when "a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state [for] ... conduct is 'knowingly[.]'" The state concludes that this provision required proof that the Knixes "knowingly" engaged in a scheme to defraud.

The state's argument is sound as far as it goes, but it does not go far enough, for it ignores the ordinary and unmistakable meaning of the words "scheme to defraud." The ordinary definitions of both words strongly imply an element of intentionality. In relevant part, Webster's defines "scheme" as "a plan or program of something to be done: a planned undertaking ... as ... a crafty or unethical project[.]" And Webster's defines "defraud" to mean "to take or withhold from (one) some possession, right, or interest by calculated misstatement or perversion of truth, trickery, or other deception." [9]

Alaska's scheme to defraud statute provides no indication that the words "scheme" and "defraud" are used in anything other than their ordinary meaning. Neither word is defined in Alaska's criminal code. As defined by the dictionary, the individual words describe conduct directed toward a specific objective. These words are coupled in AS 11.46.600(a) by the purposive word "to," yielding the statutory phrase, "scheme to defraud," which unmistakably refers to purposive conduct—a scheme—that is intended to achieve a specific result—a fraud. The notion of intentional conduct is thus intrinsic in the ordinary meaning of the term "scheme to defraud."

The legislative commentary to the scheme to defraud statute corroborates this analysis. The commentary makes it clear that Alaska's

---

have made no showing that any testimony they proposed to give might have been relevant; indeed, they have never unequivocally asserted that they actually would have testified had the trial court undertaken further efforts to elicit a voluntary waiver.

**9.** Webster's Third New International Dictionary (unabridged ed.1966).

scheme to defraud provision was based in part on the federal mail fraud statute:

> Subsections (a)[ (1) ] and [ (2) ] of the statute are based on 18 U.S.C. § 1341 (1970) and the revised versions of that provision appearing in the proposed Federal Criminal Code § 1437 95th Cong., 1st Sess. § 1734 (1977). The federal provision is commonly referred to as the mail fraud statute.
>
> A substantial body of case law has developed around the mail fraud statute making it an effective tool in the area of consumer frauds. Because the language of the proposed statute in part parallels that of the mail fraud statute, it is expected that the judicial decisions under the federal provision will be highly relevant to the construction of the Code provision.

Commentary on the Alaska Revised Criminal Code, Senate Journal Supplement 47 (1978).

Case law interpreting the federal statute uniformly supports our conclusion that the phrase "scheme to defraud" describes purposeful conduct. Like Alaska's scheme to defraud provision, the federal mail fraud statute proscribes participation in a scheme to defraud and does not specify the applicable culpable mental state:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... [uses the mail commits a felony].

18 U.S.C. § 1341. Federal courts construing the mail fraud statute's reference to "scheme ... to defraud" unanimously agree that the phrase necessarily implies specific intent.[10]

In short, we think the state mistaken in arguing that Alaska's scheme to defraud statute does not require proof of specific intent. We construe the statutory phrase "scheme to defraud" as meaning a scheme intended to defraud.[11]

■ Our conclusion, however, does not necessarily mean that the trial court committed plain error—or, for that matter, any error at all—in failing to instruct the jury, *sua sponte*, on the need to find specific intent. Here, the trial court gave the jury the Alaska Pattern Jury Instruction for the offense of scheme to defraud, which required the state to prove beyond a reasonable doubt that the defendant "knowingly engaged in conduct constituting a scheme." The culpable mental state instruction challenged by the Knixes thus faithfully reflects the wording of the pattern instruction.[12]

The Knixes cannot plausibly claim that this instruction was erroneous in requiring proof

**10.** *See, e.g., United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir.1976) ("Since the term 'scheme to defraud' connotes some degree of planning by the perpetrator, it is essential that the evidence show the defendant entertained an intent to defraud."); *United States v. Nance*, 502 F.2d 615, 618 (8th Cir.1974) (" 'Scheme' to defraud within the purview of this section involves some connotation of planning and pattern. Thus, intent to defraud is an essential element."); *see also United States v. Kreimer*, 609 F.2d 126 (5th Cir.1980); *United States v. Van Dyke*, 605 F.2d 220 (6th Cir.1979); *United States v. Beecroft*, 608 F.2d 753 (9th Cir.1979); *United States v. Williams*, 545 F.2d 47 n. 2 (8th Cir.1976) ("The government must show beyond a reasonable doubt that the defendant acted with an intent to defraud under § 1341."); *United States v. Jones*, 425 F.2d 1048 (9th Cir.1970); *United States v. Koenig*, 388 F.Supp. 670 (S.D.N.Y.1974).

**11.** We note that the legislature has defined "intent to defraud" in AS 11.46.990(10) as meaning:
> (A) an intent to injure someone's interest which has value or an intent to use deception; or

> (B) knowledge that the defendant is facilitating a fraud or injury to be perpetrated or inflicted by someone else.

**12.** Alaska Pattern Jury Instruction (Criminal) 46.600 reads, in relevant part:
> In order to establish the crime of scheme to defraud, it is necessary for the state to prove beyond a reasonable doubt the following:
>
> First, that the event in question occurred at or near   (place)   and on or about  (date)  ;
>
> Second, that   (defendant)   knowingly engaged in conduct constituting a scheme;
>
> Third, that the scheme was to [defraud five or more persons] [obtain property or services from five or more persons by false or fraudulent pretenses, representation, or promise] [to defraud one or more persons of $10,000] [obtain $10,000 or more from one or more persons by false or fraudulent pretense, representation, or promise]; and
>
> Fourth, that defendant obtained property or services in accordance with the scheme.

of knowing participation in a scheme to defraud. If the instruction was erroneous at all, its error was one of omission: its failure to require proof of specific intent to defraud in addition to proof of knowing participation in a scheme. This point is well illustrated by the federal pattern jury instruction for the mail fraud statute, an instruction cited and relied on by the Knixes themselves. In relevant part, it requires the jury to find both knowing participation and specific intent to defraud:

> (1) the defendant[s] ... knowingly participated in a scheme ... to defraud [or] ... knowingly participated in a scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises ...
> (2) the defendant[s] did so with the intent to defraud[.]

Devitt, Blackmar & O'Malley, *Federal Practice and Instructions*, § 40.03 (1990).

As we have previously pointed out, the Knixes can belatedly complain of the instruction given below only if its omission of specific intent language amounted to plain error: that is, if the omission was obviously erroneous and substantially prejudiced the Knixes' trial. We find no obvious error or substantial prejudice. We reach this conclusion for precisely the reason that prompted us to hold that the crime of scheme to defraud requires proof of specific intent: the element of specific intent is implicit in the plain meaning of the words "scheme to defraud."

Under AS 11.81.900(a)(1), "a person acts 'intentionally' with respect to a result described by a provision of law defining an offense when the person's conscious objective is to cause that result[.]" It seems all but inconceivable that a knowing participant in a scheme to defraud—that is, by dictionary definition, "a planned undertaking" or "crafty or unethical project" to "take or withhold [property of another] by calculated misstatement or perversion of truth"—could avoid acting intentionally.

Just as the phrase "scheme to defraud" unmistakably refers to conduct directed at achieving a conscious objective—obtaining property of another by fraud—so the trial court's instruction requiring the jury to find that the Knixes knowingly engaged in a scheme to defraud unmistakably communicated the need to find that the Knixes acted with specific intent to defraud—that they engaged in their scheme with the "conscious objective ... to cause that result[.]" AS 11.81.900(a)(1). And just as it is all but inconceivable that the Knixes could have knowingly engaged in a scheme to defraud without acting intentionally, so it is all but inconceivable that a reasonable juror could find them guilty of knowing participation in the scheme without necessarily concluding that they acted with specific intent to defraud.

The Knixes complain that the omission of specific intent language from their scheme to defraud instruction might have prejudiced them by allowing the jury to convict them for participating in a "scheme *that* defraud[ed]" rather than in a "scheme *to* defraud." (Emphasis by the Knixes.) The simple and sufficient answer to this complaint is that the court never told the jury to convict the Knixes upon proof of a scheme "that" defrauded; rather, the court explicitly instructed the jury to convict only if convinced beyond a reasonable doubt that they engaged in a scheme "to" defraud.

As a matter of common sense, we think that this distinction is one that reasonable jurors would understand and correctly apply. The jury instructions as a whole said nothing to suggest that knowing participation in a scheme to defraud did not require a finding of intent to defraud. Moreover, at no point in its final argument to the jury did the state attempt to characterize scheme to defraud as a general intent, rather than a specific intent, crime. Indeed, the prosecution expressly characterized the Knixes' acts as intentional.

The controversy at trial centered on the existence of a scheme. The prosecution argued that the Knixes intentionally schemed to defraud the state of welfare benefits; the Knixes responded that there was no scheme at all—that they had acted innocently and that if the state overpaid their welfare benefits, this was due to miscommunication and good-faith error. In convicting the Knixes of engaging in a scheme to defraud, the jury

obviously decided this dispute in favor of the state. Moreover, in simultaneously convicting the Knixes of the additional crime of theft by deception, the jury necessarily found that the Knixes had acted intentionally, since the jury instruction on theft by deception expressly required proof of specific intent to defraud.

■ We ordinarily presume that a jury follows the trial court's instructions. The record in this case provides no reason to suppose that the Knixes' jury strayed from its duty to heed the scheme to defraud instruction as actually given or that the jury interpreted the instruction in other than a common sense manner.

In summary, even though the disputed scheme to defraud instruction failed to expressly incorporate a specific intent requirement, the instruction did not preclude the jury from basing its verdict on proof of specific intent to defraud; to the contrary, the instruction implicitly required such proof. Absent an objection and a request for specific intent language, the instruction was legally sufficient as given;[13] and under the circumstances of this case, it resulted in no discernible prejudice. We find no plain error.

■ The Knixes' final claim is that their convictions for theft by deception (second-degree theft) should have merged with their scheme to defraud convictions. The state

concedes error. We are empowered to accept this concession *if it is supported by law and factually grounded.* *Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972). We find that it is.

Under the charges and theory pursued by the state at trial, the fraudulent scheme for which the Knixes were convicted consisted of the individual acts of theft for which they were simultaneously convicted. Under the circumstances of this case, the thefts and the scheme to defraud involved no appreciable differences in intent or conduct; and in the specific factual context of this case, there was no significant variance in the basic societal interests served by the theft and scheme to defraud statutes. Double jeopardy thus precludes multiple punishment for these offenses. *Whitton v. State*, 479 P.2d 302, 312 (Alaska 1970).

Accordingly, the convictions for perjury and scheme to defraud are AFFIRMED; on remand, the superior court is DIRECTED to issue amended judgments vacating the convictions for second-degree theft.

---

13. *See Adams v. State*, 718 P.2d 164, 166 (Alaska App.1986) (finding no plain error despite erroneous instruction—given strength of the evidence as well as the nature of the theory of defense, no obvious prejudice resulted); *cf. Hilbish v. State*, 891 P.2d at 850; *Bidwell v. State*, 656 P.2d 592, 595 (Alaska App.1983).