**Gerard R. LaPARLE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–6414.**

Court of Appeals of Alaska.

April 17, 1998.

Rehearing Denied May 14, 1998.

---

John M. Murtagh, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

## OPINION

MANNHEIMER, Judge.

Gerard R. LaParle, a Fairbanks lawyer, represented another lawyer, Dennis Bump, in a divorce action. Acting in collusion, LaParle and Bump concealed marital assets from Bump's wife, then split the money between themselves after the property settlement was final. For his part in this affair, LaParle was convicted of scheme to defraud, AS 11.46.600(a)(2), first-degree theft, AS 11.46.120(a), and perjury, AS 11.56.200(a). LaParle now appeals these convictions. We conclude that LaParle's jury was misinstructed on the elements of scheme to defraud, and we therefore reverse LaParle's conviction for that crime. However, we affirm LaParle's convictions for first-degree theft and perjury.

### Facts of the case—scheme to defraud and theft

Dennis Bump had been putting income from his law practice into four bank accounts that his wife did not know about. When Bump's wife filed for divorce, LaParle counseled Bump to disclose three of these accounts to his wife, so that she would think that Bump was dealing honestly with her. At the same time, Bump would close the fourth account (which contained almost $78,000) and give the money to LaParle as a "retainer" for his services in the divorce. LaParle assured Bump that he would invoke the attorney-client privilege to prevent disclosure of the source or the amount of this "retainer". After the divorce was concluded, LaParle would return the unused portion of this "retainer" to Bump. Bump would then enjoy the money free of any claim by his former wife.

Bump decided to follow LaParle's advice. He closed the undisclosed fourth bank account and transferred the proceeds—$77,850.02—to LaParle.

Bump and his wife ultimately settled the divorce action without going to trial. Bump's wife remained ignorant of the fourth bank account and the $78,000 "retainer" when she negotiated the settlement. After the case was concluded, LaParle subtracted his fee and then returned the unused "retainer"—$67,814.71—to Bump.

### Was the jury correctly instructed on the elements of scheme to defraud?

In the jury instruction defining the elements of the crime of scheme to defraud, the jury was told that LaParle was guilty of this crime if he either "intended to defraud [Bump's former wife] or acted recklessly with regard to the purpose of the scheme or the means used to advance the scheme". This instruction was incorrect. As we recently held in *Knix v. State*, 922 P.2d 913, 920–21 (Alaska App.1996), the crime of scheme to defraud requires proof that the defendant acted with intent to defraud. It was not sufficient for the State to prove that LaParle recklessly disregarded the possibility that Bump was trying to defraud his wife.

The error in the jury instruction was exacerbated by the prosecutor's summation to the jury:

> [The statute is violated if LaParle] acted recklessly with regard to the purpose of the scheme, ... or, alternatively, recklessly with respect to the means used to advance the scheme[.] Was his conduct ... when he reviewed or didn't review the discovery responses, [or] when he participated or didn't participate in the settlement negotiations, reckless ... with respect to those means? Was his conduct reckless with respect to accepting the check and not making sure that that money was disclosed? Was his conduct reckless when he returned the sum of $67,000 without giving any notice to either Ms. Bump, by now the former Ms. Bump, or her lawyer, that he had made those returns, with the refund of that amount of money?

Because the jury was told (both in the erroneous jury instruction and in the prosecutor's summation) that they should convict LaParle of scheme to defraud if they found that LaParle was merely reckless concerning the possibility that Bump was scheming to defraud his wife, we must reverse LaParle's conviction of this offense.

### Was the money in Bump's undisclosed bank account the "property of another" for purposes of the theft statute?

The $78,000 in Bump's undisclosed bank account represented earnings from his

law practice during his marriage. This money therefore constituted a marital asset. *See, e.g., Bousquet v. Bousquet,* 731 P.2d 1211, 1215 (Alaska 1987). In effect, the money was jointly owned by both Bump and his wife (even though Bump's wife remained ignorant of its existence).

LaParle argues that, because this money was jointly owned by Bump and his wife, Bump could not steal this money from his wife. More generally, LaParle contends that co-owners of property can not steal from each other—that, as between co-owners of property, the commonly-held property is not "property of another". LaParle asserts that Bump, as co-owner of the bank account, had a complete right to control or dispose of the money. LaParle concedes that Bump might commit fraud with regard to this money, but he contends that Bump could not commit "theft" of the money. Thus, LaParle concludes, since he was charged with theft as Bump's accomplice, if Bump was not guilty of theft, LaParle could not be found guilty of theft under a complicity theory.

LaParle's argument is based on the common-law rule that a person can not commit larceny of property that the person holds in common with others. This rule appears to be derived directly from the elements of common-law larceny. At common law, larceny required proof of a trespassory taking. R. Perkins & R. Boyce, *Criminal Law* (3rd edition, 1982), p. 292, 303–04.

> To prove larceny, the government not only had to prove that the defendant intended to use someone's property for purposes inconsistent with the owner's rights, but also had to prove that the defendant had no right to take possession of the property—that the defendant committed a trespass by the very act of laying hands on the property.

*Strother v. State,* 891 P.2d 214, 224 (Alaska App.1995); *see also* 891 P.2d at 224 n. 5. Because each co-owner of property normally has equal right to possession of the property, a co-owner's asportation of the property would not constitute a trespass and thus would not constitute common-law larceny, even if done with intent to deprive the other co-owners. *Perkins & Boyce, supra,* at 302.

However, as noted in *Perkins & Boyce,* "Modern legislation has tended ... to move in the direction of providing a penalty for the co-owner who wrongfully appropriates ... property to which others are equally entitled". *Id.* Alaska has enacted such legislation.

■ Under the general definition of theft in AS 11.46.100(1), the State must prove that the defendant "obtain[ed] the property of another". The question thus becomes whether Bump and LaParle obtained the "property of another", as that phrase is defined in Alaska law, when they hid and made off with the $78,000 that Bump had earned from practicing law during the marriage.

The phrase "property of another" is defined in AS 11.46.990(12). The pertinent part of this statutory definition reads:

> "property of another" means property in which a person has an interest which the defendant is not privileged to infringe, whether or not the defendant also has an interest in the property[.]

The $78,000 was concededly a marital asset; it should have been included among the marital property that was divided between Bump and his wife when the marriage ended. By concealing the existence of this $78,000 and appropriating this money to themselves, Bump and LaParle deprived Bump's wife of her marital interest in the money, something that Bump was not privileged to do. It therefore appears that, under AS 11.46.990(12), the money in the undisclosed bank account was "property of another", and that Bump and LaParle therefore committed theft when they concealed this money and later appropriated it to their own purposes.

This conclusion is supported by the Criminal Code Revision Subcommission's commentary to the draft definition of "property of another". The Subcommission's proposed definition was essentially the same as the definition ultimately adopted by the legislature: "property of another" was "property in which [another] person has an interest which the actor is not privileged to infringe". *See* TD 11.46.990(8). In their commentary, the drafters clearly declared their intention to change the common-law rule; they stated

that "[their] definition embodie[d] the policy that co-owners of property should be as well protected against depredations by other co-owners as they are against outsiders." *See* Alaska Criminal Code Revision, Tentative Draft, Part 3, p. 21.

Our conclusion that "property of another" includes the undivided property rights of co-owners is also bolstered by decisions from other states. *See People v. Llamas,* 51 Cal.App.4th 1729, 60 Cal.Rptr.2d 357, 361–62 (1997) (holding that a spouse can be convicted of theft for taking community property); *Commonwealth v. Mescall,* 405 Pa.Super. 326, 592 A.2d 687, 690–91 (1991) (same); *People v. Kahanic,* 196 Cal.App.3d 461, 241 Cal. Rptr. 722, 723 (1987) (holding that a spouse can be convicted of vandalism for destroying community property); *State v. Webb,* 64 Wash.App. 480, 824 P.2d 1257, 1262–63 (1992) (same). *See also State v. Kuntz,* 265 Mont. 253, 875 P.2d 1034, 1036 (1994) (a partner can commit theft of partnership assets if he uses the assets for non-partnership purposes without the consent of the other partners); *State v. Sylvester,* 516 N.W.2d 845, 849 (Iowa 1994) (a partner can be convicted of embezzling partnership assets); *State v. Larsen,* 834 P.2d 586, 590–91 (Utah App.1992) (same).

Based on the wording of AS 11.46.990(12), the commentary that accompanied the tentative draft of this provision, and the decisions of other jurisdictions cited in the preceding paragraph, we conclude that the commonly-held property of a married couple can constitute "property of another", even as between the two spouses. That is, it is legally possible in Alaska for a spouse to commit theft of marital property.

This is not to say that a husband or wife commits theft whenever they spend funds from a joint checking account without the other spouse's knowledge or permission, or whenever they use common funds to make a purchase or an investment that the other spouse does not approve of. Before a husband or wife can be convicted of stealing marital property, AS 11.46.990(12) requires the government to prove that the defendant "[was] not privileged to infringe" the other spouse's interest. In most instances, both

spouses have equal right to possess, use, or dispose of marital property. Thus, one spouse's unilateral decision to draw funds from a joint checking account or to give away or sell a marital possession normally will not constitute theft, because the actor-spouse will have had a privilege to infringe the other spouse's interest in the property.

We confronted a similar problem in *Strother v. State,* 891 P.2d 214 (Alaska App.1995). *Strother* presented the issue of whether, in the absence of a child-custody decree awarding primary custody to one spouse, a husband or wife could be convicted of custodial interference for absconding with the couple's child. We held that "[even] when a child is entrusted to joint custodians" who both possess an undifferentiated right of custody, one of the joint custodians can commit the offense of custodial interference by "tak[ing] exclusive physical custody of the child in a manner that defeats the rights of the other joint custodian." *Id.* at 223. At the same time, however, we noted that if a joint custodian is charged with custodial interference, "the actus reus of the crime must be examined with care". *Id.*

> When parents are joint custodians of a child, they repeatedly take exclusive physical control of the child on a temporary basis for any number of reasons.... A parent who remains a joint custodian can take the child away from home—even outside the state—without violating the custodial interference statutes, because such an act generally does not deprive the other joint custodian of his or her custody rights.

*Strother,* 891 P.2d at 224.

This same principle applies to cases in which one spouse is charged with stealing property held in common by the two marriage partners. Because each spouse normally has wide-ranging authority to use or dispose of marital property, "the actus reus of the [alleged theft] must be examined with care". One can imagine situations in which it would be difficult to determine whether the defendant-spouse was privileged to defeat the property interest of the other spouse. However, LaParle's assertion is that, under Alaska law, a spouse can *never* commit theft

of marital property. That assertion is wrong.

█ Moreover, even though one can imagine difficult cases, the act of theft committed by Bump and LaParle is at the core of the statutory prohibition. Knowing that Bump's marriage was about to end and that the property of the marriage was to be inventoried and divided between the spouses, Bump and LaParle conspired to conceal the existence of $78,000 in marital assets; having successfully done this, they waited until after the property settlement was final and then they divided the money between themselves. The avowed purpose of these acts was to defeat the wife's interest in this money, and, under these facts, Bump was not privileged to defeat his wife's interest. The concealed $78,000 was therefore "property of another" under AS 11.46.990(12), and Bump and LaParle committed theft when they took this money.

### Facts of the case—perjury

In his final contention on appeal, LaParle challenges his conviction for perjury. LaParle was charged with perjury for his complicity in a false sworn statement signed by Bump and filed with the superior court during the divorce proceedings.

During the discovery phase of the divorce proceedings, the attorney representing Bump's wife served Bump with various interrogatories and requests for production. In Request for Production No. 3, Bump was asked to produce "all checking account statements[,] including all canceled checks and deposit slips, [and] all savings account statements[,] including all deposit and withdrawal slips", for any account to which Bump had made deposits or from which he had made withdrawals during the preceding five years. This request encompassed the bank account with the $78,000 that Bump and LaParle were conspiring to conceal.

Bump signed and filed a document responding to the various requests for production. With regard to Request for Production No. 3, Bump responded that all of the requested documents were already in his wife's possession. At the end of this document, the following statement appeared:

DENNIS BUMP deposes and says that he has read the foregoing answers to Interrogatories [sic], and has signed the same, and acknowledges that [these] answers are true to the best of his knowledge.

Bump was at this time actively conspiring to hide the $78,000 from his wife; he therefore apparently knew that his answer to Request for Production No. 3 was false. Nevertheless, Bump signed this statement in front of a notary public, and the notary public then signed a certification (a "jurat" [1]) that Bump had signed and sworn to the truthfulness of the document in her presence.

### Was Bump's response to Request for Production No. 3 a "false sworn statement"?

█ Under AS 11.56.200(a), a person commits perjury "if the person makes a false sworn statement which the person does not believe to be true." Viewing the evidence in the light most favorable to supporting the jury's verdict, Bump's sworn response to Request for Production No. 3 appears to fit this definition.

LaParle argues that the government presented insufficient evidence that Bump engaged in intentional falsehood. He notes that Bump (testifying as a government witness at LaParle's trial) repeatedly asserted that he believed his response to Request for Production No. 3 was truthful. The question of whether Bump engaged in conscious falsehood was a matter for the jury to decide, and there was ample circumstantial evidence to rebut Bump's testimony.

█ LaParle also argues that even if Bump was guilty of conscious falsehood, LaParle did not aid or abet Bump's crime. LaParle asserts that he failed to "carefully evaluate [Bump's] responses", and he therefore remained unaware that Bump had false-

---

1. Jurat: "[A] statement or certification added to an affidavit, telling when, before whom, and, sometimes, where the affidavit was made". *Webster's New World Dictionary of American English* (Third College Edition, 1988), p. 734. *See Knix v. State*, 922 P.2d at 917; *H.A.M.S. Company v. Electrical Contractors of Alaska, Inc.*, 563 P.2d 258, 260 (Alaska 1977).

ly responded to Request for Production No. 3. This, too, was a matter for the jury.

▮▮▮ LaParle next asserts that even though Bump signed the document in front of the notary public, Bump did not really mean to certify his answers under oath. LaParle points out that Bump's concluding statement refers to "[i]nterrogatories", not requests for production, and LaParle further points out that Alaska Civil Rule 34(b) does not require responses to requests for production to be submitted under oath. From these two facts, LaParle deduces that Bump's concluding statement (and the notary public's jurat that follows it) must have been included by mistake or inadvertence, and that Bump did not really mean to swear to the correctness of his responses to the requests for production when he signed the document in front of the notary public. LaParle suggests instead that Bump believed he was signing (and swearing to the truth of) a duplicate copy of his interrogatory answers.

Again, Bump's understanding of the document and his intentions when he signed it were matters for the jury to decide. There was substantial evidence to support a finding that Bump understood that he was swearing to the correctness of his responses and that, when he did so, he believed that his response to Request for Production No. 3 was false.

Finally, LaParle argues that, as a matter of law, the inclusion of a jurat at the end of a document does not convert that document into a "sworn statement". LaParle points out that the first page of the document does not contain prefatory language indicating that what follows is being asserted under oath, and he argues that Bump's statement at the end of the document and the notary public's accompanying jurat are legally insufficient to make the document an "affidavit".

LaParle relies on the rule that a document can constitute an "affidavit"—a sworn statement—even when the document contains no concluding jurat (that is, no concluding certification by a notary public), so long as the document bears other indications that the assertions in it were, in fact, made under oath. *Knix v. State*, 922 P.2d 913, 917 (Alaska App.1996). From this, LaParle derives

the purported converse rule that the inclusion of a jurat is legally insufficient to prove that a document is an affidavit. This does not follow.

▮▮▮ The fact that a document can qualify as a sworn statement even though a concluding jurat is omitted does not mean that the presence of a jurat is irrelevant. A jurat is an explicit certification by a notary public that the person signing the document appeared before the notary and swore or affirmed that the assertions in the document were true. When a document ends with a jurat, this would seem to be prima facie evidence that the document is in fact an affidavit.

▮▮▮ Moreover, in the present case, Bump's response to the requests for production ends with more than simply a jurat. Directly above the jurat, the document contains Bump's own written statement and signature; in this statement, Bump "deposes and says that he has read the foregoing answers" and that those answers "are true to the best of his knowledge".

The inclusion of these two certifications—Bump's personal assertion that he affirmed the truth of his answers, and the notary's assertion that Bump signed the document and swore to the truth of the answers in her presence—are sufficient to prove that the document is a "sworn statement" for purposes of the perjury statute. "No particular form of oath or affirmation is required by Alaska law[.]" *Anchorage Sand & Gravel Co. v. Wooldridge*, 619 P.2d 1014, 1016 (Alaska 1980), quoted in *Knix*, 922 P.2d at 916.

## Conclusion

For the reasons explained in this opinion, LaParle's conviction for scheme to defraud is REVERSED, while LaParle's convictions for theft and perjury are AFFIRMED.