Sean Burdetto HUGHES, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7713.

Court of Appeals of Alaska.

Oct. 17, 2002.

Rex Lamont Butler, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Sean Burdetto Hughes entered the house of his estranged wife after he learned that another man, Derwin Hunter, had spent the night there. Brandishing a chef's knife, Hughes threatened to kill his wife, and then he stormed to the bedroom where Hunter was located. Hughes tried to break into the bedroom, first with a knife and then with a screwdriver.

Hughes finally succeeded in kicking down the bedroom door. He and Hunter struggled briefly until a friend of the family, Ricky Meredith, intervened. Meredith restrained Hughes and advised Hunter to leave the house. Hunter took this advice: he gathered his belongings and left before the police arrived.

Based on this episode, Hughes was convicted of third-degree assault (for placing Hunter in fear of imminent serious physical injury by means of a dangerous instrument)[1], third-degree criminal mischief (for intentionally damaging his wife's property by breaking the bedroom door)[2], and reckless endangerment (for recklessly engaging in conduct that created a substantial risk of serious physical injury to his estranged wife, Meredith, and Hunter)[3].

Hughes appeals his convictions on various grounds, each of which is discussed below. For the reasons explained here, we affirm Hughes's convictions.

*The claim that the State failed to present exculpatory evidence at grand jury regarding the third-degree assault charge*

Shortly after the incident, an Anchorage police officer interviewed Derwin Hunter. When the officer asked Hunter, "Were you afraid?", Hunter replied: "No, not really. I didn't think he was gonna do anything to me.... As far as the knife is concerned, I deal with that every day...."

Hughes points out that a charge of third-degree assault under AS 11.41.220(a)(1)(A) requires the State to prove that the victim was "place[d] ... in fear of imminent serious physical injury". Based on this statutory language, Hughes argues that he would be innocent of this charge if, despite his actions, Hunter was not afraid of being hurt. Hughes therefore contends that Hunter's statement was "exculpatory evidence" under the rule announced in *Frink v. State,* 597 P.2d 154, 164–66 (Alaska 1979), and that the

1. AS 11.41.220(a)(1)(A).

2. AS 11.46.484(a)(1).

3. AS 11.41.250(a).

prosecutor was obliged to present Hunter's statement to the grand jury.

■ Under *Frink*, a prosecutor is obliged to inform the grand jury of evidence that exculpates the defendant. However, the State's duty to present exculpatory evidence to the grand jury extends only to evidence that tends to negate the defendant's guilt in and of itself.[4] Here, Hunter's statement may conceivably have provided some ammunition for the defense, but it was not exculpatory in and of itself.

It is true that the third-degree assault statute requires proof that the defendant "place[d] another person in fear of imminent serious physical injury".[5] But, as used in this statute, the word "fear" does not refer to fright, dread, intimidation, panic, or terror. Rather, a person is "placed in fear" of imminent injury if the person reasonably perceives or understands a threat of imminent injury. The victim's subjective reaction to this perception is irrelevant. It does not matter whether the victim of the assault calmly confronts the danger or quivers in terror. The question is whether the victim perceives the threat.

This point of law is discussed in Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 7.16(b), a subsection entitled, "Assault as Intentional Scaring". Immediately following this heading, the authors provide an explanatory footnote:

> The word "scare" or "frighten" is . . . used loosely herein as a short term for the more cumbersome but more accurate expression "causing reasonable apprehension of immediate bodily harm". *See* W. Prosser and W. Keeton, *Torts*, § 10 (5th ed.1984), speaking of the requirement of apprehension of immediate bodily harm required for a civil assault: "Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated."

*Id.,* Vol. 2, p. 315 n. 26.

Hunter's statement that he was not afraid of being injured may have been false bravado

(as the State suggests). Alternatively, Hunter's statement may have accurately reflected the calm of a man who often faces physical danger. (Hunter told the officer that "as far as the knife is concerned, [he] deal[s] with that every day".)

But in either case, Hunter's statement did not negate the State's allegation that Hunter reasonably perceived a danger of imminent serious physical injury because of Hughes's actions. Thus, Hunter's statement was not "exculpatory evidence" within the meaning of the *Frink* rule.

*The trial judge's ruling that Hughes could not introduce hearsay testimony concerning a statement that Hunter made to the police*

■ At Hughes's trial, as the defense attorney ended his cross-examination of Officer Denise Rollins, the attorney asked Rollins, "[Is it true that] Mr. Hunter told you [that] he was just watching the television while [Hughes was trying to break down the door of the bedroom]?" The prosecutor objected that the defense attorney's question called for hearsay; Hughes's attorney did not respond. The trial judge, Superior Court Judge Larry D. Card, sustained the prosecutor's objection. The defense attorney then announced that he had no further questions of the witness.

A few minutes later, after the witness had left the stand, Hughes's attorney offered an answer to the prosecutor's objection. The defense attorney suggested that Hunter's out-of-court statement was admissible under the "state of mind" exception to the hearsay rule. The defense attorney argued that "if Mr. Hunter was sitting up there in the bed[room], watching TV while this fight is going on, then that means [he was not] placed in fear of imminent physical injury". Judge Card ruled that the "state of mind" exception did not apply.

On appeal, Hughes abandons his "state of mind" theory and instead argues that Hunter's statement was not hearsay at all. Under

---

4. *See Mustafoski v. State,* 954 P.2d 1042, 1045 (Alaska App.1998); *State v. McDonald,* 872 P.2d 627, 639 (Alaska App.1994).

5. AS 11.41.220(a)(1)(A).

Evidence Rule 801(c), hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Hughes contends that Hunter's statement was important because of what it tended to prove about Hunter's state of mind at the time of the alleged assault. Hughes therefore argues that the statement was not offered to prove the truth of the matter asserted. But this argument is flawed.

If Hunter was watching television while an angry husband was allegedly trying to break down the door and was threatening his wife with a knife, this might tend to undercut the assault charge. But any inference about Hunter's mental state—his apparent lack of concern—necessarily rests on the premise that there be admissible evidence to show that Hunter was in fact watching television during all the commotion. There was no evidence of this except for Hunter's out-of-court statement. Thus, the defense attorney was indeed offering Hunter's statement for the truth of the matter asserted—offering it to prove that Hunter was watching television while Hughes was trying to break into the bedroom.

The statement was therefore hearsay, and Judge Card correctly sustained the objection to the defense attorney's question.

Hughes argues for the first time on appeal that Hunter's statement may have been admissible under the "catch-all" exception to the hearsay rule, Evidence Rule 803(23). We reject this argument for two reasons.

■ First, Hughes did not present this theory of admissibility to the trial judge. He therefore can not raise it on appeal.[6]

Second, hearsay is not admissible under Evidence Rule 803(23) unless the proponent of the hearsay shows that the out-of-court statement carries "circumstantial guarantees of trustworthiness" equivalent to the other recognized exceptions to the hearsay rule.[7]

Hughes does not show that Hunter's statement met this requirement.

*The trial judge's denial of Hughes's request for a week's continuance*

■ On the first day of trial, prior to the parties' opening statements, the prosecutor announced that the State had been unable to locate Derwin Hunter, but the prosecutor told the court that he was willing to proceed without Hunter's testimony. In response, Hughes's attorney asked Judge Card to dismiss the third-degree assault charge. The defense attorney argued that Hunter was a crucial witness because Hunter would concede that he was not afraid during the incident. This concession, according to the defense attorney, would disprove the State's allegation of assault.

The prosecutor answered that dismissal was inappropriate. The prosecutor told the court that "it sounds ... like the defense wants [a] dismissal because they haven't bothered to subpoena the victim.... [If] they think his testimony is that important, maybe they should subpoena him."

The defense attorney replied that he had, in fact, made attempts to locate Hunter. He had traced Hunter to North Carolina or Virginia, but there the trail ended. The defense attorney conceded that it was "unlikely" that Hunter could be found.

Judge Card denied the defense motion to dismiss the assault charge. The judge ruled that if Hunter was unavailable to testify, each side would have to deal with that fact.

This issue surfaced again at the end of the third day of trial, after the prosecution had rested its case-in-chief. Hughes's attorney argued that Hunter's absence from the trial constituted a denial of Hughes's right of due process. The defense attorney contended that the State had a constitutional obligation to present Hunter as a witness if he was available. Judge Card denied the defense

---

**6.** *See Jones v. State,* 576 P.2d 997, 1000–1001 (Alaska 1978); *Dyer v. State,* 666 P.2d 438, 450–451 (Alaska App.1983) (a defendant who unsuccessfully offers evidence under one theory of admissibility at trial can not argue a different theory of admissibility on appeal).

**7.** *See Ryan v. State,* 899 P.2d 1371, 1379 (Alaska App.1995) ("[T]he touchstone for determining the admissibility of hearsay under [the catch-all exception] is its trustworthiness. The hearsay must possess at least the same guarantees of trustworthiness that characterize the other types of admissible hearsay listed [in the rule].").

request for two reasons. First, the record indicated that Hunter could not be located—that he was, in fact, unavailable. Second, assuming that Hunter was available, he was equally available to both parties, so the State did not violate Hughes's right of due process by failing or neglecting to subpoena him.

At this point, the defense attorney asked Judge Card to continue the trial for one week so that the defense could locate Hunter and procure his testimony. Judge Card did not reject this request out of hand, but he told the defense attorney that he was not inclined to declare a recess in the middle of the trial unless the defense attorney was able "to tell [him] something more about the situation":

> *The Court:* [You must let me know] whether ... you have an idea of where [Hunter] is, and [then] talk to him or his mother or whomever he lives with and see when he could get up here, and how long it would take you folks to get him. Then we'll decide if we're going to recess the trial. I'm not going to recess the trial for a week without knowing any of that.... 
>
> [T]he State has indicated from the beginning that they weren't going to call [Hunter] as a witness. And so it's not like the first notice was given today that he wasn't going to be called. So if you want to find out ... if you can get in touch with him, how long it would take him to get up here, assuming you can get a ticket.... I may be willing to recess for twenty-four hours, till ... Friday, and continue the trial Friday and get done—or even [next] Monday if, for example, he has to finish ... a work shift. [*N.B.:* This conversation was taking place on a Wednesday afternoon.] You know, that sounds reasonable.... But not a week without [any more information].

Judge Card then told the defense attorney that he would take the request for a continuance under advisement overnight. The judge directed the defense attorney to "give [him] some more information tomorrow morning". Hughes's attorney responded, "Okay. Good." The defense attorney then mentioned the possibility that Hunter might not come to Alaska voluntarily-that Hughes would have to apply for an interstate subpoena. Judge Card responded, "I'll sign whatever you need."

The next morning, Judge Card asked the defense attorney if he had anything to report about Hunter's availability as a witness. The defense attorney answered,

> *Defense Attorney:* Judge, I'm going to be honest with you: I didn't have time to try to call yesterday. I was in court [all day], and then [I] tried to deal with some office matters before everyone went home at five o'clock, [so] I didn't have time to call down there—realizing that [Hunter] does not have a home phone and it would be nine o'clock on the East Coast ..., and so I just—it was a crash and burn evening, pretty much.

Based on the defense attorney's response, Judge Card denied the request for a continuance. The judge reiterated that he was "not going to give a week's continuance based on ... no [information] at all."

On appeal, Hughes does not challenge Judge Card's refusal to dismiss the assault charge because of Hunter's absence. Hughes does, however, challenge Judge Card's denial of the week's continuance. He contends that Judge Card unreasonably denied him an extra week to find a crucial defense witness.

In *Ross v. State,* 836 P.2d 378 (Alaska App.1992), this Court listed the factors that a trial judge should consider when deciding whether to grant a mid-trial request for a continuance to obtain the testimony of an absent witness:

> (1) whether the [absent witness's] testimony is material to the case;
>
> (2) whether the testimony can be elicited from another source;
>
> (3) whether the testimony is cumulative;
>
> (4) [the] probability of securing the absent witness in a reasonable time;
>
> (5) whether the requesting party was diligent and acted in good faith;
>
> (6) the inconvenience to the court and/or others; [and]
>
> (7) the likelihood that the testimony would have affected the jury's verdict.

*Ross,* 836 P.2d at 381 (summarizing the discussion in *Salazar v. State,* 559 P.2d 66, 72–75 (Alaska 1976)).

Using these criteria, we conclude that Judge Card acted reasonably when he denied Hughes's mid-trial request for a continuance.

With regard to the defense attorney's diligence, Judge Card noted that the defense attorney had known since the beginning of the case that Hunter was a potential witness, and had known for several days that Hunter was not going to testify for the State. Nevertheless, Judge Card did not deny Hughes's request for a continuance out of hand. Instead, he gave the defense attorney a day in which to find out more information about where Hunter was and whether he could be brought to Alaska to testify.

Despite the defense attorney's claim that Hunter was a crucial witness for the defense, the defense attorney took no steps to locate Hunter in the time given him. The defense attorney explained that he was in court for much of the day, but Judge Card reasonably could have concluded that a diligent attorney would have assigned other people to this task if Hunter was indeed such an important witness. Moreover, the defense attorney admitted that, even when he got out of court, he attended to office business instead of using the time to try to locate Hunter—until it was too late to call the East Coast. In short, the defense attorney did not act diligently.

The probability that Hunter's testimony could be secured in a reasonable amount of time appears to have been Judge Card's central concern. He repeatedly told the defense attorney that he was not prepared to order a recess of the trial without some reason to think that Hunter could be located and brought to Alaska to testify. As described above, when the issue of Hunter's testimony arose early in the trial, the defense attorney conceded that Hunter probably could not be located. As the proponent of the continuance, the defense attorney was obliged to present Judge Card with good reason to believe that this was no longer the case—that Hunter could be located and his

testimony procured. The defense attorney did not do so.

And with regard to the materiality of Hunter's testimony, we note that the defense attorney's claim that Hunter was a crucial witness rested on the same argument that we rejected in the first section of this opinion— the argument that Hughes could not be convicted of assault if Hunter was not subjectively afraid of Hughes. This proposition of law is mistaken. This undercuts Hughes's assertion that he could not get a fair trial without Hunter's testimony.

In the last analysis, Hughes's attorney asked Judge Card to continue the trial for a week without giving the judge any reason to believe that the delay would achieve anything. We therefore conclude that Judge Card did not abuse his discretion when he denied Hughes's mid-trial request for a continuance.

*Hughes's motion for a judgement of acquittal on the assault charge*

 Hughes argues that he is entitled to a judgement of acquittal on the third-degree assault charge involving Derwin Hunter. But Hughes argues the evidence in the light most favorable to himself. The test is whether the evidence is sufficient to support the conviction when viewed in the light most favorable to upholding the jury's verdict.[8]

Moreover, Hughes's primary argument for acquittal is the same argument that we rejected in the first section of this opinion-the argument that the State could not prove assault if there was no evidence that Hunter was subjectively afraid of Hughes. That is not the issue. The question is whether the State presented evidence from which the jury could reasonably conclude that, because of Hughes's conduct, Hunter reasonably perceived a danger that he would suffer imminent serious physical injury. Viewed in the light most favorable to upholding the jury's verdict, the State's evidence was sufficient to establish this element.

---

**8.** *See Hentzner v. State,* 613 P.2d 821, 823 (Alaska 1980); *Siggelkow v. State,* 648 P.2d 611, 613 (Alaska App.1982).

*Hughes's motion for a judgement of acquittal on the criminal mischief charge*

■ Under AS 11.46.484(a)(1), a person commits the crime of third-degree criminal mischief if the person intentionally "damages property of another" having a value of at least $50, and if the person "ha[s] no right to do so [and no] reasonable ground to believe [that they have] such a right".

Hughes concedes that the State presented sufficient evidence to support the conclusion that Hughes intentionally broke down the bedroom door. But Hughes argues that he could not lawfully be convicted of criminal mischief for this conduct because he and his estranged wife were co-owners of the house. Based on this co-ownership, Hughes contends that he did not damage "property of another".

Hughes underlying argument is that, even though his wife was co-owner of the door, the door could not be "property of another" so long as it also belonged to him. We explicitly rejected this argument in *LaParle v. State*, 957 P.2d 330 (Alaska App.1998).

"Property of another" is defined in AS 11.46.990(13) as "property in which [another] person has an interest which the defendant is not privileged to infringe, whether or not the defendant also has an interest in the property". In *LaParle*, we noted that the drafters of this provision, in their commentary, had "clearly indicated their intention [that] co-owners of property should be as well protected against depredations by other co-owners as they are against outsiders".[9] We also noted several decisions from other states holding that a spouse can be convicted for stealing or vandalizing property co-owned by the married couple.[10] We then concluded:

> Based on the [statutory definition of "property of another"], the commentary that accompanied the tentative draft of this provision, and the decisions of other juris-

dictions cited in the preceding paragraph, we conclude that the commonly-held property of a married couple can constitute "property of another", even as between the two spouses. That is, it is legally possible in Alaska for a spouse to commit theft of marital property.

*LaParle*, 957 P.2d at 334. For these same reasons, we conclude that it is legally possible for a spouse to be convicted of criminal mischief for vandalizing marital property.

However, this does not completely resolve the matter, for the criminal mischief statute also requires proof that the defendant "[had no] reasonable ground to believe [that they had] a right" to destroy the property at issue. Although Hughes's co-ownership of the door does not, in itself, give him a defense to the charge of criminal mischief, the question remains whether Hughes's co-ownership of the property might have given him a "reasonable ground to believe" that he was entitled to infringe his wife's interest in the door by breaking it down.

It is conceivable that, under certain circumstances, a spouse might reasonably believe that they were entitled to destroy or intentionally damage marital property—*e.g.*, to accomplish the remodeling of a room, or to save life or property during a fire or other emergency. But this would be an issue of fact for the jury.

The question here is whether Hughes subjectively and reasonably believed that, given the circumstances of this case, he had a right to vandalize or destroy a door that belonged (in part) to his wife. The evidence at trial, if viewed in the light most favorable to upholding the jury's verdict, was sufficient to support the conclusion that Hughes had no such reasonable belief. (We note, moreover, that when Hughes's attorney delivered his summation to the jury, the attorney never sug-

9. *LaParle*, 957 P.2d at 333–34 (quoting Alaska Criminal Code Revision, Tentative Draft, Part 3, p. 21).

10. *LaParle*, 957 P.2d at 334, citing: *People v. Llamas*, 51 Cal.App.4th 1729, 60 Cal.Rptr.2d 357, 361–62 (Cal.App.1997) (holding that a spouse can be convicted of theft for taking community property); *Commonwealth v. Mescall*, 405 Pa.Super. 326, 592 A.2d 687, 690–91 (1991) (same); *People v. Kahanic*, 196 Cal.App.3d 461, 241 Cal.Rptr. 722, 723 (1987) (holding that a spouse can be convicted of vandalism for destroying community property); *State v. Webb*, 64 Wash.App. 480, 824 P.2d 1257, 1262–63 (1992) (same).

gested that Hughes believed that he had a right to destroy or damage the door.)

In sum, the State's evidence was sufficient to support Hughes's conviction for third-degree criminal mischief.

*Hughes's argument that his conviction for reckless endangerment should merge with his conviction for third-degree assault on Hunter*

■ As discussed above, Hughes was convicted of third-degree assault for recklessly causing Derwin Hunter to apprehend imminent serious physical injury by means of a dangerous instrument—a knife. In addition, Hughes was convicted of reckless endangerment under AS 11.41.250(a) for "recklessly engag[ing] in conduct that created a substantial risk of serious physical injury to another person".

The above-quoted language is from the indictment as well as the statute. In other words, the indictment did not specify the victims of the offense—the people for whom Hughes's conduct created a risk of injury. This lack of specificity in the indictment engendered a legal controversy at the end of the trial.

After Hughes was convicted of both third-degree assault and reckless endangerment, the defense attorney asked Judge Card to merge the reckless endangerment conviction into the third-degree assault conviction. The defense attorney argued that this was required because (1) reckless endangerment is a lesser offense included within third-degree assault, (2) both offenses stemmed from the same conduct, and (3) Derwin Hunter was the victim of both crimes.[11] Judge Card rejected this argument because he concluded that there were as many as three victims of the reckless endangerment count—all three of the persons present in the home: Hughes's wife, Ricky Meredith (the friend who intervened in the fight), and Hunter.

On appeal, Hughes renews his argument that the two crimes should merge. He points out that the jury was not asked to fill out a special verdict form specifying the person or persons endangered by Hughes's conduct. Thus, Hughes claims, the jury's decision is irresolvably ambiguous regarding the identity of the victim(s) of the reckless endangerment charge. Hughes argues that, because of this ambiguity, it is possible that the jury concluded that Hunter was the sole victim of the reckless endangerment—in which case, the reckless endangerment conviction should merge with the third-degree assault conviction because both convictions punish essentially the same act.

But the alleged ambiguity vanishes when the record is examined. Although the indictment does not specify the victims of the reckless endangerment, the prosecutor repeatedly told the jury—both in opening statement and in summation—that the conduct underlying this charge was Hughes's act of waving a knife in the presence of his wife and his friend Meredith (initially in the kitchen, and then as Hughes first approached the bedroom). Hughes's wife and Ricky Meredith were the only people in Hughes's presence during this time.

Hughes's wife testified that, during the confrontation in the kitchen, Hughes was waving the knife, making threats, and yelling for Hunter to come out of the bedroom. Meredith agreed that Hughes grabbed a knife during the confrontation. But Meredith testified unambiguously that, at his urging, Hughes put the knife down and returned the weapon to the kitchen before he went back to the bedroom, broke down the bedroom door, and began struggling with Hunter.

The prosecutor's description of the reckless endangerment charge and the testimony supporting this charge resolved the potential ambiguity in the jury's verdict. Because the *actus reus* of the charge was Hughes's act of brandishing the knife in the presence of his wife and Meredith, the jury must have concluded that one or both of them were victims of this crime.

---

**11.** *See Tuckfield v. State,* 621 P.2d 1350, 1352 (Alaska 1981); *but cf. Todd v. State,* 917 P.2d 674 (Alaska 1996) (holding that a defendant can be separately convicted of both felony murder and the underlying felony).

It is conceivable that the jury concluded that Hunter was a third victim of the reckless endangerment charge. Hunter never actually saw Hughes with the knife in his hand, but the State argued that Hunter was placed in fear of imminent serious physical injury by the commotion outside the bedroom door, by Meredith's pleas to Hughes to put down the knife, and by Hughes's eventual act of breaking down the door. But this is not sufficient for Hughes to win his merger argument.

To show entitlement to a merger of the two convictions, Hughes must demonstrate either that Hunter was the sole victim of both charges or, at least, that it is impossible to tell whether the jury might have viewed Hunter as the sole victim of both charges. Here, although the evidence conceivably supported the conclusion that Hunter was an *additional* victim of the reckless endangerment charge, the evidence and the prosecutor's arguments ineluctably lead to the conclusion that the jury viewed Hughes's wife and/or Meredith as victims of this crime. The fact that the reckless endangerment charge included two victims other than Hunter means that this charge does not merge with the third-degree assault charge in which the sole victim was Hunter.

Compare *State v. Dunlop*, 721 P.2d 604, 609 (Alaska 1986), where the supreme court held that a single act of reckless driving can support multiple convictions for homicide and assault when more than one victim is killed or injured; and *Cooper v. State*, 595 P.2d 648, 649 (Alaska 1979), where the supreme court held that the act of firing one shot toward three people will support three convictions for assault.

### Conclusion

The judgement of the superior court is AFFIRMED.