Wynter Jai CATHEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8092.

Court of Appeals of Alaska.

Dec. 13, 2002.

Gayle Brown, Anchorage, for Appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Wynter Jai Cathey and an accomplice, Faatafa Afusia, broke into an apartment and robbed the two residents at gunpoint. Based on this conduct, Cathey was convicted of first-degree burglary, first-degree robbery, and two counts of third-degree assault.[1] He now appeals his convictions.

Cathey attacks his indictment by asserting that the prosecutor knowingly used perjured testimony to obtain the indictment, failed to present evidence suggesting that no gun was used in the robbery, and misinstructed the grand jury regarding the standard of proof required for an indictment. Cathey also contends that the evidence presented to the grand jury was insufficient to support his indictment for assault because the evidence suggested that at least one of the victims was not afraid of the robbers.

Finally, Cathey contends that he was entitled to a new trial based on newly discovered evidence: the testimony of a witness who (Cathey asserts) provided him with an alibi.

For the reasons explained here, we conclude that none of Cathey's arguments has

1. AS 11.46.300(a)(1), AS 11.41.500(a)(1), and AS 11.41.220(a)(1)(A), respectively.

legal merit, and we therefore affirm his convictions.

### Underlying facts

Justin Heinzeroth and Kimberlee Johnson were napping in their apartment on Memorial Day afternoon when two men kicked the front door open. Heinzeroth was asleep in the front room, so the robbers saw him first. One of the men (Cathey) pointed a large-caliber revolver at Heinzeroth and demanded money.

Johnson was in the bedroom; she was awakened by the crash of the door and Heinzeroth's screams. Johnson peeked into the front room and saw one of the intruders pointing a gun at Heinzeroth. She then went to the bedroom telephone and called 911 to report the robbery-in-progress. While Johnson was on the phone, the other robber (Afusia) entered the bedroom and ripped the cord out of the telephone.

A few moments later, Cathey came into the bedroom, threatened Johnson with the revolver, and demanded to know if she had any jewelry. Johnson handed Cathey a heart-shaped ring, but then she tried to escape with $300 rent money that was stored in her jewelry box. Afusia stopped her before she could run from the apartment. Afusia subdued Johnson by holding her to the floor with his foot on her head. Cathey was then able to pry the $300 from Johnson's grasp. After watching this, Heinzeroth handed over another $490 to Cathey.

But Johnson's 911 call had not been in vain. While all of this was occurring, the police were already on their way to the apartment. At the sound of approaching sirens, Cathey and Afusia fled the apartment; they climbed into a getaway car driven by a third accomplice and drove away. The robbers' car was barely out of sight when the police arrived. The officers quickly obtained a description of the robbers and their car, and then they set off in pursuit.

Within six minutes, the police spotted the robbers' car. After a short chase, the three robbers abandoned their vehicle and tried to escape on foot. All of them were quickly arrested. Afusia had the $300 that was stolen from Johnson. However, the police never found the revolver or the $490 that Heinzeroth said he surrendered to the robbers.

The police then brought the suspects back to the apartment to see if Heinzeroth and Johnson could identify any of them. Although Heinzeroth and Johnson could not identify the getaway driver, Heinzeroth unhesitatingly identified Cathey and Afusia as the two men who entered the apartment and committed the robbery.

Afusia had a distinctive physique: he stood six foot six and weighed more than 300 pounds. Cathey also had a distinctive appearance: his hair was in a ponytail, and he was wearing a black-and-red jersey and black pants. In addition, Heinzeroth explained that "you don't quickly forget the face of a person [who is] pointing a large-caliber pistol at you". Heinzeroth's identification of Cathey was corroborated by the contents of Cathey's pants pocket: the pocket contained the heart-shaped ring that Johnson had surrendered during the robbery.

### Cathey's attacks on his indictment

Cathey claims that his indictment is flawed because, during the presentation of the case to the grand jury, the prosecutor failed to play the tape of Johnson's 911 call. Cathey asserts that the tape of the 911 call was exculpatory evidence—*i.e.*, evidence that the prosecutor was obliged to present under the rule announced in *Frink v. State*[2]—because Johnson never expressly told the 911 dispatcher that the robbers were armed.

The record is unclear as to whether Johnson told the 911 dispatcher that the robbers were armed. According to the dispatcher, Johnson was hysterical and some of what she said was hard to understand. Moreover, regardless of Johnson's precise words, the dispatcher evidently concluded that Johnson was reporting an armed robbery in progress—as shown by the fact that twelve police officers were sent to the apartment, and by the fact two of these officers stated in their reports that they had been dispatched to an armed robbery.

2.   597 P.2d 154, 164–66 (Alaska 1979).

We further note that the 911 tape was played for the jury at Cathey's trial and, afterwards, Cathey's trial attorney did not argue that Johnson failed to mention a gun.

■ But regardless of whether Johnson explicitly told the 911 dispatcher that the robbers were armed, the tape of Johnson's conversation with the dispatcher did not constitute "exculpatory evidence" for purposes of the *Frink* rule.

■ A prosecutor's duty to apprise the grand jury of exculpatory evidence extends only to "evidence that tends, in and of itself, to negate the defendant's guilt".[3] Both Heinzeroth and Johnson testified at grand jury that one of the robbers was armed with a revolver. Even assuming that Johnson did not explicitly tell the 911 dispatcher that the robbers were armed, this omission would not "in and of itself" demonstrate that Heinzeroth's and Johnson's grand jury testimony on this point was false or mistaken. As our supreme court has stated,

> The mere fact of inconsistency does not automatically convert ... evidence into exculpatory material. If we were to adopt [such a] broad reading of the exculpatory evidence rule, [our] action would go a long way toward turning [grand jury] proceedings into a "mini-trial". It is our intention to avoid such a result ....

*Preston v. State*, 615 P.2d 594, 602 (Alaska 1980). We therefore conclude that even if Johnson did not expressly tell the 911 dispatcher that the robbers were armed, this would not constitute exculpatory evidence for grand jury purposes.

■ In a related argument, Cathey asserts that the prosecutor knowingly presented perjured testimony to the grand jury. According to Cathey, the perjury occurred when Johnson testified that she was robbed at gunpoint. Cathey contends that the 911 call (specifically, Johnson's purported failure to expressly say that the robbers were armed) demonstrates that her grand jury testimony on this subject was perjured. Cathey further contends that, because the

prosecutor had possession of the 911 tape, he must have "knowingly condon[ed] the introduction of [Johnson's] perjured testimony".

As we have already explained, Johnson's exact words during the 911 call are not clear. But even assuming that Johnson failed to tell the 911 dispatcher that the robbers were armed, this omission does not, in and of itself, affirmatively prove that Cathey was unarmed, nor does it prove that Johnson committed perjury when she testified that Cathey was armed. Even less does it prove that the prosecutor knowingly condoned perjury when he presented Johnson's testimony to the grand jury.

■ Next, Cathey argues that the prosecutor knowingly gave the grand jurors a false instruction concerning the level of proof required to support an indictment. Alaska Criminal Rule 6(q) states:

> The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant.

This language has engendered litigation in the past, and one could argue that its precise meaning remains unsettled to this day. However, in *Sheldon v. State*, 796 P.2d 831 (Alaska App.1990), this Court rejected the argument that the phrase "evidence ... [that] would warrant a conviction of the defendant" referred to proof beyond a reasonable doubt. Instead, we interpreted Criminal Rule 6(q) to mean that "a grand jury should return an indictment when convinced of the probability of the defendant's guilt".[4]

Cathey claims that the prosecutor in his case knowingly misstated this standard to the grand jurors—and that, in doing so, the prosecutor was "taking advantage of [his] position [as grand jury advisor] to ... actively deceive the Grand Jury". Cathey bases this claim on remarks that the prosecutor made just before the grand jury began its deliberations. The prosecutor told the grand jurors:

> *Prosecutor:* [The] grand jury ... [is] not expected to be a mini-trial where the State produces all of the evidence that the

---

**3.** *State v. McDonald*, 872 P.2d 627, 639 (Alaska App.1994).

**4.** *Sheldon*, 796 P.2d at 836–37.

State has against the defendants. Your job is to determine whether or not there is enough evidence to show that [the alleged crimes] probably happened.... [Y]our job as a grand juror is to take the evidence . . . and determine whether, if unexplained or uncontradicted at trial, it supports the charges and, basically, whether or not there is a probability that this happened.

Cathey argues that the prosecutor's remarks were a conscious misstatement of the law. Cathey concedes that the appellate courts of this state have never expressly clarified the meaning of *Sheldon's* phrase, "probability of guilt". Nevertheless, in six pages of briefing, Cathey argues that this phrase must mean that the grand jury's task is to decide whether, based on the evidence presented at grand jury, a *trial jury* would probably find the government's case proved beyond a reasonable doubt. And, based on this proposed analysis of Alaska appellate law, Cathey's appellate attorney asserts that the prosecutor "actively deceive[d]" the grand jurors when he told them that the test was whether Cathey's alleged crimes "probably happened".

We reject Cathey's proposed interpretation of *Sheldon* because it would have the grand jurors undertake a meaningless exercise. Cathey suggests that the grand jury's task is to decide whether, more likely than not, the trial jury will find that the evidence presented to the grand jury establishes the defendant's guilt beyond a reasonable doubt. But a trial jury does not hear the same type of evidentiary presentation that a grand jury hears.

Even assuming that the State presents exactly the same evidence at trial as it did at grand jury (which, in itself, is an unlikely event), the point of the trial is to allow the defendant to confront the State's witnesses through cross-examination and impeachment, to present defense witnesses, and to argue other possible interpretations of the State's evidence. In other words, a trial jury rarely hears the government's evidence without explanation or contradiction. The trial jury's task is to evaluate the government's evidence in light of potential contradictions and exculpatory explanations. It therefore makes little sense to ask the grand jurors to predict whether a trial jury would convict the defendant if the trial jury were to hear only the State's side of the case.

Instead, we conclude that the prosecutor's remarks to Cathey's grand jury satisfactorily convey *Sheldon's* "probability of guilt" test. Lawyers and judges might still reasonably debate whether Criminal Rule 6(q) establishes a "probable cause" standard or a "more probable than not" standard—or whether these two standards differ in any material way in a grand jury context. But regardless of Sheldon's precise meaning, *Sheldon* establishes that the grand jury standard of proof is no more than a preponderance of the evidence—*i.e.,* "more probable than not". Accordingly, we conclude that the prosecutor at Cathey's grand jury adequately conveyed the proper test when he told the grand jurors that "[their] job [was] to determine whether or not . . . [the alleged crimes] probably happened".

(We acknowledge that a grand jury must not only determine whether a crime occurred but also whether the defendant is legally accountable for that crime. However, Cathey does not attack the prosecutor's remarks on this ground. Moreover, given the grand jury evidence—in particular, Cathey's arrest just minutes after the robbery, the victims' identification of Cathey, and the discovery of the stolen ring in Cathey's pocket—there was essentially no chance that the grand jury would fail to find that Cathey was one of the men who broke into the apartment.)

■ We need to address one further point. Even if Cathey's proposed interpretation of *Sheldon* had been correct, this would offer no support for Cathey's accusation that the prosecutor actively deceived the grand jurors. Cathey's appellate attorney spends six pages of her brief explaining why *Sheldon* should be interpreted in the way she proposes. This fact inevitably leads to one conclusion: regardless of the proper interpretation of *Sheldon,* the issue was obviously debatable, and Cathey's proposed interpretation was only one potential resolution of this point of law. Thus, there is no basis for Cathey's attorney's accusation that, when the prosecutor interpreted *Sheldon* differently, he was

actively trying to deceive the grand jurors by knowingly giving them false instructions of law.

We take this opportunity to remind Cathey's appellate attorney, and all other litigators, of the reprimand that the Alaska Supreme Court issued to one of the attorneys in *Gregoire v. National Bank of Alaska:*

> [Appellate counsel] has employed abusive and intemperate language in his brief and has accused the trial court and opposing counsel of unethical and underhanded conduct.... [We reprimand counsel] and admonish[ ] him to be governed in the future by the rules of court and professional courtesy in his representations to the court and in his references to opposing counsel.

413 P.2d 27, 43–44 (Alaska 1966).

We also caution Cathey's appellate attorney that, in briefing cases to this Court, she is governed by Alaska Professional Conduct Rule 8.2(a), which declares that "a lawyer shall not make a statement ... with reckless disregard as to its truth or falsity concerning the ... integrity of a ... public legal officer". In her briefing of this case, Cathey's appellate attorney has freely accused the grand jury prosecutor of unethical and potentially criminal conduct. These charges are not even colorably supported by the record. We urge her to carefully consider before making similar unfounded charges in the future. See *In re Vollintine*, 673 P.2d 755 (Alaska 1983), where the supreme court publicly reprimanded an attorney who accused a government official of perjury and who accused opposing counsel of "cheating and lying".[5]

Cathey's final attacks on the indictment all concern the sufficiency of the grand jury evidence to support particular charges.

■ Cathey asserts that the evidence failed to support the charge of third-degree assault on Kimberlee Johnson because the evidence revealed that Johnson actively resisted the robbers and attempted to escape with her rent money. According to Cathey, Johnson's active resistance shows that she was not afraid of being shot—that she was in fact willing to risk being shot in order to save the rent money—and therefore the State failed to show that Johnson was placed "in fear of imminent serious physical injury" as required by the third-degree assault statute, AS 11.41.220(a)(1)(A).

We recently rejected this same argument in *Hughes v. State*, 56 P.3d 1088, (Alaska App. 2002),. We explained that "fear", as used in the third-degree assault statute,

> does not refer to fright, dread, intimidation, panic, or terror. Rather, a person is "placed in fear" of imminent injury if the person reasonably perceives or understands a threat of imminent injury. It does not matter whether the victim of the assault calmly confronts the danger or quivers in terror. The question is whether the victim perceives the threat.

*Id.*, at 1090.

Thus, the fact that Johnson had sufficient courage to try to escape with the rent money, and then to struggle with the robbers to retain possession of this money, does not disprove the State's allegation that she was placed in fear of imminent serious physical injury. The grand jury evidence was sufficient to support Cathey's indictment on this charge.

■ Cathey next argues that the evidence was insufficient to support Cathey's indictment for armed robbery of Justin Heinzeroth. The issue arises because the police never found the $490 that Heinzeroth said he surrendered to the robbers. Thus, it is arguable that Heinzeroth misstated the facts when he claimed that, in addition to the $300 rent money that the robbers pried from Johnson's hand, the robbers also made off with an additional $490.

But, as the State points out, Cathey was not indicted for two separate robberies committed on Johnson and Heinzeroth. Rather, Cathey was indicted on one count of first-degree robbery. This count, tracking the language of AS 11.41.510(a), charged Cathey with using or threatening the immediate use of force to take, or attempt to take, property from the immediate presence and control of

5. *Vollintine*, 673 P.2d at 756.

another. Thus, even if no money was taken from Heinzeroth, Cathey's use of force to take money from Johnson was sufficient to support Cathey's indictment for robbery.

■ Moreover, as we pointed out in *McGrew v. State*[6],

[T]he crime of robbery is committed, not only when a defendant uses force upon the person who possesses the property, but whenever a defendant uses force upon any person with the intent to prevent or overcome anyone's resistance to the taking, or to compel any person to engage in conduct that might facilitate the taking. Thus, if [a defendant] used force or threatened to use force against [one person] with the intent of preventing or overcoming resistance to the taking of property from [another person], [the defendant] committed robbery.

*McGrew*, 872 P.2d at 626.

The grand jury evidence showed that Cathey and Afusia broke into the apartment, threatened Heinzeroth with a gun, and demanded money. Even if the robbers only obtained money from Johnson, the grand jury could justifiably conclude that the robbers' assault on Heinzeroth was intended to "prevent or overcome resistance to the taking of the property or the retention of the property after taking".[7] Thus, the grand jury evidence would support Cathey's indictment for robbery even if Cathey and his accomplice got no money from Heinzeroth.

■ Finally, Cathey argues that the grand jury evidence was insufficient to support Cathey's indictment for *armed* robbery (*i.e.*, first-degree robbery) as opposed to unarmed robbery (*i.e.*, second-degree robbery). But this argument is a replay of Cathey's claim regarding the 911 call—*i.e.*, his claim that Johnson failed to expressly tell the 911 dispatcher that the robbers were armed. We have already explained that, even assuming that Johnson failed to expressly mention the gun to the 911 dispatcher, her omission did not undermine the evidence (*i.e.*, Johnson's and Heinzeroth's grand jury testimony) that Cathey was armed and that he threatened both victims with the gun. This evidence was sufficient to support Cathey's indictment for armed robbery.

For all of these reasons, we uphold the indictment.

### Cathey's motion for a new trial

■ After Cathey was tried and convicted of all the crimes alleged in the indictment, he filed a motion for a new trial. In support of the requested new trial, Cathey presented the testimony of Melanie Blazka. Ms. Blazka testified that, on the afternoon of the robbery, she saw Cathey standing next to the vehicle that was later used by the robbers as their getaway car. According to Blazka, Cathey was alone. Based on Blazka's testimony, Cathey argued that he must have been the getaway driver (rather than one of the two men who broke into the apartment).

But there were reasons to distrust Blazka's testimony. According to Blazka, she had met Cathey some eight years before, when they were both living at the McLaughlin Youth Center. Blazka testified that, until the day of the robbery, she had not seen Cathey since their days at McLaughlin, but she conceded that she had renewed her acquaintance with Cathey after he was arrested and jailed for the robbery, and that she had spoken with him frequently since then.

Moreover, the evidence indicated that even if Blazka did see Cathey standing beside the vehicle, this was approximately two hours before the robbery was committed. Based on the series of events that Blazka described (leaving work, stopping at the grocery, and then seeing Cathey on the street), Blazka saw Cathey at about quarter to four in the afternoon. But Johnson called 911 to report the robbery-in-progress at 5:27 p.m. Given this discrepancy, it was quite possible for Cathey to have been standing on the street as Blazka described, and then later to have committed the burglary and robbery as Johnson and Heinzeroth testified.

After hearing Blazka's testimony, Superior Court Judge Larry D. Card denied Cathey's motion for a new trial. First, Judge Card concluded that Blazka was not a credible witness. Judge Card next found that, even if

---

6. 872 P.2d 625 (Alaska App.1994).

7. AS 11.41.510(a).

Blazka's testimony was believed, it would not support Cathey's proposed alibi for the burglary and robbery. The judge found that Blazka's observation of Cathey on the street occurred some two hours before the burglary and robbery. Moreover, the evidence was strong that Cathey was one of the robbers. As Judge Card noted, both victims described the robber with the gun as having a ponytail and wearing distinctive clothing—descriptions that matched Cathey's appearance—and Johnson's ring was found in Cathey's pocket.

On appeal, Cathey argues that Judge Card was wrong when he found that Blazka was not a credible witness and when he found that, in any case, the timing of Blazka's observation did not establish an alibi for Cathey. In essence, Cathey claims that Judge Card abused his discretion when he did not view the evidence in the light most favorable to Cathey.

When a judge decides a motion for new trial based on newly discovered evidence, the ultimate question is whether the newly discovered evidence would likely produce a different verdict.[8] Assuming that the defendant establishes diligence in discovering the new evidence, the judge's task is to assess "the credibility of the newly discovered evidence [as well as the] probable impact of that evidence".[9] Having reviewed the record in this case, we conclude that Judge Card's findings regarding the credibility and probative force of Blazka's testimony are based on reasonable inferences from the evidence. We therefore uphold Judge Card's ultimate ruling that Blazka's testimony, if heard at a new trial, either would not be believed or, if believed, would not produce a different verdict.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

8. *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962); *Lewis v. State*, 901 P.2d 448, 450 (Alaska App.1995); *Charles v. State*, 780 P.2d 377, 383 (Alaska App.1989).

9. *Gonzales v. State*, 691 P.2d 285, 287 (Alaska App.1984).