John Jack GARGAN, Appellant,

v.

STATE of Alaska, Appellee.

· No. A–2968.

Court of Appeals of Alaska.

Feb. 15, 1991.

John Jack Gargan, appellant pro se, and Joyce E. Bamberger, Law Office of Joyce E. Bamberger, Anchorage, for appellant.

Shelley K. Chaffin, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS, J., and ANDREWS, District Court Judge.*

## OPINION

ANDREWS, District Court Judge.

John Gargan was convicted of solicitation to commit perjury, in violation of AS 11.56.-200(a) and AS 11.31.110(a), and tampering with physical evidence, in violation of AS 11.56.610(a)(2). He was sentenced to twenty-four months, with twenty months suspended and one year of probation. He was also sentenced to five hundred hours of community service. He now appeals his conviction and sentence raising a number of issues.

The charges against Gargan for solicitation of perjury and tampering with evidence occurred after Gargan's son, Adrian, was arrested for the burglary of Willard Geddes' home. Adrian spent several days in jail and contacted his father on December 22 asking him to speak to both Geddes and the public defender about the burglary charge.

Adrian's public defender was Cynthia Strout. Strout testified at trial that when she spoke to Gargan on the telephone, they discussed the elements of the charge that the state had to prove to convict Adrian. She explained that consent to enter the victim's house constituted a defense to the burglary charge.

On the evening of December 22, Gargan went to the Avenue Bar where Geddes worked as a bartender. Gargan asked Geddes if he had been to the police about the burglary and Geddes said that he had gone to the police to get the stolen items back or to sign a complaint. Geddes agreed to sign a letter to be given to the police stating that Adrian had Geddes' permission to enter Geddes' home. Geddes was motivated to sign a letter that he knew was false because he thought it would expedite the return of his property. On December 23, Gargan returned to meet Geddes with the letter of consent and Geddes signed it.

Gargan brought the letter to Cynthia Strout hoping that the letter would help to get the case dismissed. He spoke to her at Adrian's bail hearing on December 24, and came to the understanding that the statement would not be helpful to Adrian's case because it was not notarized.

On December 28, Gargan prepared a second statement. Then he and the notary met with Geddes at Geddes' workplace. This second statement falsely explained that Adrian had permission to enter Geddes' home and to remove certain belongings. The notary requested to see Geddes' identification before he signed. After he showed his I.D., Geddes signed the letter. It was then notarized. No verbal oath was administered by the notary, but under the signature, it purported to be "sworn and subscribed." Gargan then gave the second statement to the public defender, who only held it and did not make use of it.

At Adrian's pre-indictment hearing on December 31, 1987, Gargan, hoping to assist in his son's case, informed the judge about the notarized statement. Eventually the notarized statement was discovered as false and Gargan was charged with soliciting Geddes to commit perjury and tampering with evidence. Gargan's first trial was consolidated with his son's; Gargan repre-

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

sented himself, while Adrian was represented by the public defender.

At trial Gargan made an opening statement, which included several objectionable statements and violated a protective order. The public defender representing Adrian then made a motion to sever the trial and for a mistrial as to Adrian because Gargan's statements had prejudiced Adrian's case. The judge granted both these motions. Additionally, the court found that Gargan was unable to focus his arguments or obey court orders, and found that Gargan must be represented by counsel at the new trial before the new jury.

Prior to the second trial, Gargan made a motion to the court for permission to act as co-counsel. The prosecutor objected to this motion, which was ultimately denied by Superior Court Judge Peter A. Michalski on June 27, 1988.

At Gargan's second trial, the defense called Mary Sue Wilson, the notary who notarized Geddes' statement. She testified that she did not administer an oath to Geddes.

Gargan took the stand to testify in his own defense. On direct, he claimed several times that he did not have a complete understanding of the criminal justice system. The prosecution sought to admit Gargan's criminal record to show that he had knowledge of the criminal justice system. The court allowed the prosecutor to cross-examine him on his criminal record, over the objection of defense counsel. Gargan's criminal record consisted of twenty-five convictions which extended from 1945 to 1976.

At the close of the trial Gargan objected to proposed Jury Instruction No. 16 which defined "a sworn statement" as "a statement knowingly given under oath or affirmation attesting to the truth of what is stated, including a notarized statement." The defense argued for an instruction that would have stated a notarized statement is, by definition, not a "sworn statement" for the purposes of a perjury prosecution unless the notary administered an oath or affirmation at the time of the document's certification. The judge gave the jury instruction as originally proposed.

The defense also objected to proposed Jury Instruction No. 22, which contained the definition of intent, arguing that it impermissibly shifted the burden of proof to the defendant. He argued that the instruction violated his right to be presumed innocent. The court gave the proposed instruction.

Gargan was convicted of the crimes of solicitation to commit perjury and tampering with physical evidence. He was sentenced to twenty-four months with twenty months suspended on each count, to be served concurrently, along with community work service and one year's probation.

## I. SELF–REPRESENTATION

Gargan argues that the trial judge improperly deprived him of his constitutional right to represent himself.

■ Although there is a right for a defendant to represent himself, that right is not absolute. *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974). The defendant must knowingly, intelligently, and voluntarily waive counsel and must be minimally capable of presenting a coherent case to the jury. *Burks v. State*, 748 P.2d 1178, 1180 (Alaska App.1988). In analyzing the boundaries of the right to self-representation, the *Burks* court decided that ignorance of the law alone would not prevent a defendant from representing himself. Where the trial court finds, however, the defendant lacks the ability to make a coherent presentation, the defendant may be required to be represented by counsel. *Burks* at 1180–81.

■ The trial judge's decision that Gargan was required to be represented by an attorney was not reached arbitrarily. The record makes clear that during the first trial when Gargan and his son were on trial together, the defendant made numerous statements and repeatedly mentioned inadmissible facts about his son's prior conduct which prejudiced his son's case. As a result the judge ordered a mistrial in the case of his son, and Adrian Gargan's trial was

severed from his father's. The court found that Gargan was unable to focus and was unable to obey the court's orders. As a result, the judge ordered that Gargan be represented by counsel. The trial judge stayed clearly within the boundaries of *Burks* in entering this order. His findings were explicit and were supported by ample evidence in the record of the defendant's inability to manage his own case within the rules of evidence and in the general procedure of an orderly courtroom. The trial judge did not err.

 Secondly, the defendant claims that the court erred in denying his request to act as co-counsel. There is no constitutional right of a defendant to participate in a trial as co-counsel, *Garrison v. State*, 762 P.2d 465, 467 (Alaska App.1988). A trial judge has broad discretion to regulate trials and the conduct of counsel in the courtroom, and includes the discretion to deny co-counsel status. *Ortberg v. State*, 751 P.2d 1368, 1375 (Alaska App.1988). In *Ortberg*, we affirmed the trial court's denial of the defendant's request to appear as co-counsel because the trial judge was convinced that the defendant was incapable of representing himself in a coherent, rational manner. *Id.*

In the case at hand, the trial judge made findings to the effect that Gargan was unable to focus his arguments or obey the orders of the court. This court must conclude therefore, that the trial court did not abuse its discretion when Gargan's motion for co-counsel status was denied.

## II. ADMISSION OF PRIOR CRIMINAL RECORD

 At trial, Gargan testified on his own behalf. During the direct examination, counsel for the defense, seeking to prove that the defendant did not have the requisite specific intent to mislead a public servant on the tampering charge, pursued the issue of the defendant's state of mind and motivation in preparing the admittedly perjured statements, urging Geddes to sign them, and then giving them to the authorities handling Adrian's case. Gargan testified that his purpose was to help Geddes get his belongings back from the police and was not to mislead the police or prosecutors in the course of their criminal investigation. He explained that he did not even understand that formal charges had been brought against his son and therefore was working on the assumption that if he presented the false statements to the police he could do no harm. He emphasized his ignorance of the status of the investigation as his primary defense. He claimed, "I am not an attorney. I am the dumbest guy in this courtroom...." He also claimed that he did not know that prosecutors and defenders often engaged in plea bargaining. He elaborated on cross-examination that he had not "been in the system in some 20 or 21 years." This claim of ignorance of the criminal justice system was the basis for his sole defense to the tampering with evidence charge, because if believed, it would negate the element of specific intent to mislead public servants which was essential to a conviction.

On cross-examination, the prosecution sought to attack Gargan's defense by proving Gargan specifically intended to mislead the police in their investigation and facilitate a favorable plea bargain for his son when he presented the statements to public officials. After repeated claims of ignorance by Gargan,[1] the prosecutor queried, "[A]re you saying that at the time you helped create these two documents that we're talking about here in court, that you

---

1. At the beginning of the cross-examination, the prosecution asked Gargan how he expected the public defender would make use of the false statements by Geddes, if not to help get the burglary charges against Adrian dropped.

 Gargan claimed he had "no idea" what purpose he had in mind or what he expected. She asked why Gargan had not told the truth, why he had mentioned the perjured statement to Judge Stemp at Gargan's son's hearing, and why

Gargan wanted Mr. Branchflower of the district attorney's office to see the statement, if the reason was not to mislead and to facilitate favorable plea bargaining in Adrian's case. To each of these questions Gargan only answered that he did not know his purpose, that he did not know how the officials would make use of such statements. He repeatedly supported his claim of ignorance by reminding the prosecutor that he was not an attorney.

didn't have any knowledge about how the criminal justice system worked from the angle of the police, the prosecution and the defense attorney[?]" Gargan responded, "Like I said, may this jury find me guilty if I did. I never had any idea."

At this point the prosecutor requested a recess. Out of the presence of the jury the prosecutor moved to set aside the court's protective order regarding introduction of Gargan's prior criminal record. The record consisted of a multi-page FBI "rap sheet" listing twenty-five prosecutions, eleven of which resulted in conviction, commencing in 1948 and ending in 1968.

The prosecution's purpose in seeking admission of this evidence was to prove that Gargan lied on the witness stand when he claimed he had no knowledge of how the criminal justice system worked, including how lawyers, district attorneys, police officers, and defense attorneys work, and to discredit Gargan's assertion that he knew nothing of the plea bargaining process. The prosecutor advised the trial court that she was not seeking to admit that Gargan had been convicted of any crime but simply to establish that he had been prosecuted twenty-five times in the last forty years to establish that he had some working knowledge of the criminal justice system.

The trial court entertained extensive argument from opposing counsel on the question and reviewed the law cited by the parties. The trial court concluded that Gargan had "left the impression that he had a little contact with [the criminal justice system] over 20 years ago ... [T]hat is not a fair characterization of the evidence relating to his potential for knowledge" and therefore determined that evidence of his prior record could come in. The court cautioned, "Now, that doesn't mean carte blanche ... Is there some way it can be done with ... dispatch and carefulness?" The prosecutor proposed two general questions which would be asked of Gargan:

1. [I]sn't it true that you've been prosecuted yourself on criminal charges at least 25 times between 1945 and 1976?

2. Isn't it true that—and of those 25 prosecutions, at least eleven of them resulted in a conviction and the remainder were dropped?

Trial resumed and the prosecutor repeated the approved questions. To the first question, Gargan answered, "I don't believe so." To the second question Gargan replied, "If you say so. I'm going to say yes because I haven't really had a chance to look at this, but what crimes?" The prosecutor tried to focus Gargan on the general fact of conviction. Gargan insisted, "Let me ask you this. If you wish to ask me in all of this, I am not ashamed of this criminal record ... No, I am not ashamed of that criminal record whatsoever, with an explanation to each one of them if I can recall."

The examination then continued at some length. Gargan testified that he was the one who "emphasized" and "persisted" in obtaining his criminal record. He volunteered that he should have been convicted of an assault with a dangerous weapon, a charge on which he had been acquitted.

The prosecutor ended the cross-examination asking, "[Y]ou're a person, aren't you, that's actually had a lot of firsthand experience with the criminal justice system, aren't you[?]" To this Gargan replied, "I have not had that much experience with criminal justice at all."

The judge gave the jury a limiting instruction indicating that the convictions were to be considered only with regard to evaluating the defendant's knowledge of the criminal justice system.

On redirect, Gargan's attorney emphasized the minor nature of many of the prosecutions and the limited nature of the contact that Gargan had with the court on most of the charges.

The defendant argues that the court erred in granting the motion to use the prior convictions and charges. He first contends that under Rule 609 of the Alaska Rules of Evidence, evidence of prior convictions is permissible only when the prior crime involves dishonesty or false statements and when the conviction is less than five years old. Because neither of these

criteria apply in this case, Gargan contends that the prior conviction should not have been used to impeach him on cross-examination.

The state agrees that the FBI conviction record was inadmissible under Rule 609 as evidence of crimes affecting Gargan's veracity. The state contends, however, that the criminal record was admissible under the doctrine of specific contradiction and under Rule 404(b)(1) because it directly contradicted the testimony given by Gargan regarding his knowledge of the workings of the criminal justice system.

■ Under Alaska law, evidence of past convictions which would be otherwise inadmissible under Rule 609, may be introduced to contradict a witness's specific testimony as to a material issue, even though this may indirectly impeach the witness's credibility. *Shane v. Rhines*, 672 P.2d 895, 898–99 (Alaska 1983) (trial court did not abuse its discretion in refusing to admit drunk driving conviction in a civil action involving an automobile accident because drinking was admitted by the defendant and the criminal conviction was irrelevant); *Davenport v. State*, 519 P.2d 452, 455 (Alaska 1974) (admission of prior burglary proper because it was relevant to a material and unresolved issue in the case).

The propriety of admitting evidence of past convictions to contradict the defendant's testimony depends on whether the testimony to be contradicted was relevant to some contested material fact in issue.

In order to prove Gargan guilty of tampering with physical evidence, the state was required to prove that the defendant intended to mislead a public servant who is engaged in an official proceeding or criminal investigation.

In his direct and cross-examination, Gargan repeatedly claimed that he could not have intended to mislead officials because he had no knowledge that his presentation of the false statements to the police, public defender, and to the judge at his son's hearing might mislead these public servants as they proceeded with Gargan's son's case.

Accordingly, the only material fact in issue was whether Gargan made, presented, and used the false statements with a culpable mental state. The sole question for the jury, therefore, was whether Gargan intended to mislead the police, the prosecutor, and the judge with these statements in order to attain his goal of getting the charges against his son dropped. Gargan's extensive experience and understanding of the workings of the criminal justice system, reflected in his criminal record, was highly probative on this issue. His criminal record gives a strong indication that when Gargan presented the false statements to the authorities, he knew the public officials might believe the statements and conclude that no crime had been committed, resulting in a dismissal of the case.

The defendant argues that his claim that he did not understand the criminal justice system did not warrant the extensive cross-examination about each of his numerous past convictions. He contends that on balance, the prejudicial effect of the evidence far outweighed the probative value and, therefore, admission of the evidence by the trial court was error. The state, on the other hand, argues that the extensive nature of Gargan's criminal record was highly probative of the crucial issue of Gargan's mental state. We consider the propriety of admitting Gargan's extensive prior history a close question under these facts.

The trial judge, in determining whether to admit the criminal history, applied the requisite probative versus prejudicial analysis to the evidence. We are required to uphold his conclusions unless we find an abuse of discretion. *Poulin v. Zartman*, 542 P.2d 251, 260, *reh'g denied*, 548 P.2d 1299 (Alaska 1976). Gargan, aware of the potential liability of admission of his prior criminal history, sought and obtained a protective order preventing its admission. Nonetheless, in his direct testimony he strongly claimed a virtual ignorance of any aspect of the criminal justice system. The prosecutor, having received permission to "cautiously" inquire about the record, was met by Gargan's direct denial of general

facts concerning his record. On the other hand, Gargan asked the prosecutor to go over each of the entries on his FBI "rap sheet." No objection was made by the defense to this procedure. Considering that the prejudicial impact of the criminal history was greatly diminished by the fact it was twenty years old, that there was no mention of any recent criminal activity, as well as the fact that the court gave a limiting instruction, we are unable to conclude that the court abused its discretion in admitting the testimony.

## III. JURY INSTRUCTION CLAIMS

### A. *Jury Instruction No. 16—Sworn Statement*

 Jury Instruction No. 16 in Gargan's case provided a definition of a "sworn statement" as "a statement knowingly given under oath or affirmation attesting to the truth of what is stated, including a notarized statement." Gargan argues that this instruction was not complete because it did not state that a notarized statement requires administration of an oath by the official notary to be considered a true "sworn statement." He contends that without the complete definition, the jury could not find that a "sworn statement" had been made. Gargan concludes that because a sworn statement is an essential element to prove perjury, he could not, therefore, be convicted for solicitation of perjury.

The state argues, however, that a notarized statement is a "sworn statement" even if the notary does not formally administer the oath.

The statutory section concerning notarization, AS 09.63.030(a) provides that:

When a document is required by law to be notarized, the person who executes the document shall sign and swear to or affirm it before an officer authorized by law to take the person's oath or affirmation and the officer shall certify on the document that it was signed and sworn to or affirmed before the officer.

The statutory sections defining the duties of notaries are AS 44.50.010–AS 44.50.070.

With regard to presence and identification requirements, AS 44.50.070 states:

A notary public shall require oaths and affirmations to be given in the notary's presence and require persons appearing before the notary to produce identification.

It is clear from the testimony of the notary, Mary Wilson, that no verbal oath or affirmation was administered to Geddes. The written statement itself, however, purports to be given under oath. It states under Geddes' signature: "Subscribed and sworn before me...." The issue in this case, therefore, is whether a verbal oath must be administered for a statement to qualify as a "sworn statement."

The supreme court answered this question in *Anchorage Sand and Gravel Company, Inc. v. Wooldridge,* 619 P.2d 1014, 1016 (Alaska 1980). In *Wooldridge,* a corporate lien was signed and notarized, but its validity was questioned by Anchorage Sand because there was no evidence that a verbal oath was given. *Id.* The mortgaging company, on the other hand, argued that when a notary certifies a lien, the act of certification constitutes an oath. *Id.* The supreme court agreed with the mortgaging company, looking to the actual words of the lien which stated: "that the facts ... are true and correct." *Id.* The court ruled that such a declaration was a verification on its face and that no verbal oath was required. The court went further to explain: "We conclude that when a lien claimant, in the presence of a notary, affixes his signature to a written statement incorporating the necessary elements of a claim of lien, and the notary certifies this act, claimant has substantially complied with the requirement of an 'oath.'"

Gargan argues that *Wooldridge* should not apply to his case, and urges that the requirements for a sworn statement should be stricter when criminal penalties are at risk. *Cf. H.A.M.S. Co. v. Electrical Contractors of Alaska, Inc.,* 563 P.2d 258, 263–64 (Alaska 1977). He argues that unlike the lien statute, the criminal perjury statute requires the express language of an

oath and that "substantial compliance" is insufficient.

The question here, however, is not whether the perjury statute requires express language of an oath. The crucial issue in this case is whether the declaration signed by Geddes was a verification on its face of the truthfulness of the facts contained therein. When the notary is present at the signing of a document which purports to be sworn, and when the notary then notarizes the document, the requirements of the oath have been satisfied; the document qualifies as a sworn statement.

Applying this rule to the facts in Gargan's case, it is clear that there was sufficient evidence to allow the jury to conclude that the oath requirement was met. After Geddes showed his identification to the notary, he then knowingly signed the document in her presence. Furthermore, the document states that Geddes was duly sworn. Finally, the notary actually notarized it. Accordingly, all the substantial requirements of verification were fulfilled. Therefore the oath requirement was satisfied when Mary Wilson notarized the document. The notarized statement in this case was a "sworn statement" even without proof of the administration of the verbal oath.

Because the notarized statement signed by Geddes was a "sworn statement" under Alaska law, it was not an abuse of discretion for the court to give Jury Instruction No. 16 to the jury.[2]

B. *Jury Instruction No. 22—Burden of Proof*

▮ The defendant contends that Jury Instruction No. 22 was improperly given.

The relevant portion of the instruction reads as follows:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts he knowingly does or knowingly omits. It is also reasonable to infer a person does not intend the natural and probable consequences of his acts if he is unaware of the natural and probable consequences of his acts. Any such reasonable inferences are entitled to be considered by the jury in determining whether or not the prosecution has proved beyond a reasonable doubt that the defendant possessed the required intent.

Gargan claims that it is improper because under Alaska law a *Mann*-type instruction cannot be given in a specific intent crime because it impermissibly shifts the burden of proof to the defendant.

The Alaska Supreme Court decisions in *Calantas v. State*, 608 P.2d 34 (Alaska 1980), *Menard v. State*, 578 P.2d 966 (Alaska 1978), and our more recent decisions in *Hohman v. State*, 669 P.2d 1316 (Alaska App.1983) and *Bidwell v. State*, 656 P.2d 592 (Alaska App.1983) are dispositive of Gargan's claim. The instruction in this case, like the approved instruction in *Calantas*, told the jury that they could infer that the defendant intended the natural consequence of his actions, they were not required to make such a finding, and that the prosecution maintained the burden of proof on the issue. When taken together with all the other instructions reiterating the prosecutor's burden of proof, we are convinced that the instruction was proper and there was no abuse of discretion in so

---

**2.** The state argues and we agree that even if the notarized statement was not a sworn statement for purposes of proof of one of the elements of perjury, Gargan cannot prevail on his claim of error. Although a sworn statement may be an element for the offense of perjury, it is not a required element to be proven for the offense of solicitation to commit perjury.

Under Alaska law, a person commits the offense of perjury when, "the person makes a false sworn statement which the person does not believe to be true." AS 11.56.200(a). Further, AS 11.31.110(a) provides that "A person

commits the crime of solicitation if, with the intent to cause another to engage in conduct constituting a crime, the person solicits the other to engage in that conduct." Alaska Statute 11.31.110(b)(1)(B) explains that it is not a defense "that a person whom the defendant solicits could not be guilty of the crime that is the object of the solicitation." The state need not show that Geddes actually committed perjury to convict Gargan of solicitation of perjury, the state was only required to show that Gargan intended to cause Geddes to perjure himself.

instructing the jury. *Cf. Loof v. Sanders,* 686 P.2d 1205 (Alaska 1984).

## IV. SENTENCE

The defendant was convicted on both charges against him; solicitation to commit perjury and tampering with physical evidence. The court sentenced him to twenty-four months with twenty months suspended on each count to be served concurrently. He was required to perform 500 hours of community work service and placed on probation for one year. Gargan argues that this sentence was excessive.

The defendant was convicted of two class C felonies, each of which was punishable by a maximum penalty of five years. The court carefully considered the defendant's prior record and the *Chaney* criteria in imposing a sentence. The sentence imposed was not clearly mistaken. *McClain v. State,* 519 P.2d 811 (Alaska 1974).

In conclusion, we find no error and AFFIRM the trial court.