NO. COA13-912

NORTH CAROLINA COURT OF APPEALS

Filed: 15 April 2014

IN RE ADOPTION OF:
"BABY BOY"
BORN APRIL 10, 2012

Wake County
12 SP 1911

Appeal by respondents from order entered 15 February 2013 by Judge Debra Sasser in Wake County District Court. Heard in the Court of Appeals 21 January 2014.

*WAKE FAMILY LAW GROUP, by Katherine Hardersen King, for respondent-appellee.*

*Cheri C. Patrick for petitioner-appellants Laura and Richard Zug, Jr.*

*MANNING, FULTON & SKINNER, P.A., by Michael S. Harrell, for petitioner-appellant Amazing Grace Adoptions.*

ELMORE, Judge.

Laura Catherine Zug and Richard Charles Zug, Jr. (the Zugs) and Amazing Grace Adoptions (the Agency) appeal Judge Sasser's order entered 15 February 2013 declaring Amy Marie Costin's relinquishment void. After careful consideration, we reverse.

## I. Background

The facts in this case are largely undisputed. Amy Marie Costin (the birth mother) is the biological mother of a baby boy (Baby Boy) born 10 April 2012 at WakeMed Cary Hospital. The biological father of the minor child signed a relinquishment placing "Baby Boy" in the care of the Agency and has made no attempt to revoke. The birth mother contacted the agency prior to Baby Boy's birth to discuss the possibility of placing the baby for adoption. Her primary contact at the Agency was social worker Hayley Walston (Ms. Walston). On 13 December 2011, approximately halfway through her pregnancy, the birth mother officially contracted for services with the Agency. The birth mother indicated to Ms. Walston that she wanted a closed adoption and did not want the baby to be placed nearby. Thereafter, the birth mother and Ms. Walston were in frequent communication regarding her desire to relinquish the child for adoption. On 6 February 2012, Ms. Walston informed the birth mother that the agency had identified a family who would agree to her terms.

One day after Baby Boy's birth, Ms. Walston went to the hospital to obtain the birth mother's relinquishment of Baby Boy to the Agency. Under N.C. Gen. Stat. § 48-3-701(a), a birth parent "may relinquish all parental rights or guardianship

powers, including the right to consent to adoption, to an agency." To complete the relinquishment process, Ms. Walston asked a notary employed by WakeMed, Ms. Darlene Durbin ("Ms. Durbin" or "the notary"), to notarize the "Relinquishment of Minor for Adoption by Parent or Guardian" (the relinquishment). Ms. Durbin had been a notary for approximately three years and agreed to notarize the relinquishment, although she had never notarized an adoption form before and was unfamiliar with the legalities of the adoption process.

Ms. Durbin accompanied Ms. Walston to the birth mother's hospital room to witness the relinquishment. Ms. Durban testified that she stayed for "at least 30 minutes" as Ms. Walston completed the relinquishment procedure. As part of this procedure, Ms. Walston read aloud the relinquishment form and reviewed a twenty-six-question questionnaire with the birth mother that addressed all aspects of the relinquishment. The relinquishment begins, "I, Amy Marie Costin, being duly sworn, declare . . ." It also states, "I understand that my Relinquishment to Adoption of the minor may be revoked within 7 days following the day on which it is executed," and "I understand that to revoke my Relinquishment for Adoption, as provided in G.S. 48-3-706, the revocation must be made by giving

written notice to the agency to which the Relinquishment was given."

The questionnaire begins with an acknowledgement: "All forms were read aloud by the staff member and were signed in the presence of Darlene Durbin, notary, and the following questions were asked in their presence." The birth mother's responses to the questions were recorded and included the following:

Q. Do you feel that your mind is perfectly clear?

A. Yes.

Q. Has anyone told you that you must sign these papers?

A. No.

Q. Has anyone coerced you in any way or applied pressure or unduly influenced you to make an adoption plan for your child(ren)?

A. No.

Q. Did I persuade or coerce you in any way to sign a relinquishment, or has any of the Amazing Grace Adoptions staff members done so?

A. No.

Q. Do you understand you may revoke your decision within 7 days of signing this document?

A. Yes.

Q. Do you understand that if within 7 days

you decide to revoke your release you must make your revocation in writing and deliver it to the director of the agency?

A. Yes.

Q. Do you understand that when you sign these documents you are giving up all legal rights to this child(ren)?

A. Yes.

Q. Have you read and do you fully understand all the documents you are signing?

A. Yes.

Q. Do you need more time to think about your decision?

A. No.

It was not until after all of the forms were read to the birth mother that she signed the relinquishment and the questionnaire. Ms. Durbin then completed the notary certificate. The birth mother received a copy of the relinquishment. Ms. Walston testified that she had previously reviewed the relinquishment form with the birth mother several months prior.

On 18 April 2012, the seventh day after signing her relinquishment, the birth mother testified that she texted Ms. Walston sometime between 10:00 p.m. and 11:00 p.m. and asked, "is today the last day?" Ms. Walston confirmed that it was in

fact the last day that she could revoke her relinquishment. The birth mother did not attempt to revoke at that time.

The following morning (day eight), the birth mother texted Ms. Walston to indicate that she had changed her mind. Later that day, the birth mother met with Ms. Walston and the director of the Agency to discuss the situation. There is no record evidence that the birth mother ever provided the Agency with written notice of her intent to revoke her relinquishment. Ultimately, the Agency informed the birth mother that her relinquishment would not be revoked because she did not give notice of her revocation within the statutorily prescribed seven-day period. As such, the Agency proceeded with the adoption and placed Baby Boy with the Zugs on 23 April 2012. The Zugs filed their petition to adopt Baby Boy that same day. Baby Boy has since remained in the Zugs' custody.

On 11 June 2012, the birth mother filed a motion to dismiss the adoption petition and motion to declare her relinquishment void, alleging that the purported relinquishment was void for "lack of compliance with a mandatory statutory requirement[.]" The trial court took the case under advisement and, in an order filed 15 February 2013, made the following pertinent findings of fact:

6.    Ms. Darlene Durbin, an employee of WakeMed Cary Hospital, was asked to notarize the documents.  Ms. Durbin was not familiar with adoption forms and did not review the forms before undertaking to notarize them. Ms. Durbin was present for over a half hour while Ms. Walston went through a twenty-six question questionnaire dealing with various aspects of the relinquishment before having the [the birth mother] sign the purported relinquishment[].

7.  The uncontroverted evidence and Ms. Durbin's own testimony indicates that Ms. Durbin did not put either biological parent under oath before or after signing the relinquishment forms, nor did she ask them to "swear," "affirm" or any words to that effect.  No Bible or other Holy Scriptures were used by Ms. Durbin during the notary process, and no oaths or affirmations were administered prior to the purported relinquishments being signed or at any time since.

11.  Pursuant to N.C.G.S. 48-3-702(a) "A relinquishment executed by a parent or guardian must conform substantially to the requirements in this Part and **must be signed and acknowledged under oath before an individual authorized to administer oaths or take acknowledgments."** [emphasis in original]

12. The language regarding "under oath" in N.C.G.S. 48-3-702 is not mere surplus, as language regarding "under oath" is included in some sections of Chapter 48 for types of consents/relinquishments and not in others. It is precise and purposeful language. Being a parent is a fundamental right that must be protected, and while the adoption statutes should be construed liberally in many instances, the biological parents'

rights are protected by the U.S. Constitution. The child's rights to be with the biological parent(s) also must be protected. The "under oath" language in N.C.G.S. 48-3-702 is meant to prevent biological parents from claiming that they didn't understand what they were signing or didn't know what they were doing to prevent future litigation.

The trial court then made the following conclusions of law:

2. Under N.C.G.S. 48-3-702, the sex of the baby was a mandatory provision in the relinquishment but was not completed in the purported relinquishment. Additionally, under 48-3-702, the signature of Movant had to be obtained while she was under oath.

4. The purported relinquishment signed by Movant on April 11, 2012 is not a valid relinquishment in that it does not conform to the mandatory statutory requirements of a relinquishment as set out in N.C.G.S. 48-3-702 and is void to operate as a relinquishment.

5. There is no valid relinquishment by the Movant in this matter.

6. Because there was never a valid relinquishment signed by Movant, no revocation of her relinquishment was required, and the revocation statutes don't apply.

8. There was no constructive fraud or actual fraud by the [A]gency in the procurement of the relinquishment.

9. This matter should not be remanded back to the Clerk of Superior Court at this time and should remain with District Court for a

later hearing on Movant's request to dismiss
the adoption petition.

The trial court thereafter granted the birth mother's petition to declare her relinquishment void. The Zugs and the Agency (collectively petitioners) now appeal.

## II.  <u>Interlocutory Appeal</u>

In the instant case, the trial court entered an interlocutory order voiding the birth mother's relinquishment, which effectively nullified the birth mother's purported consent to the adoption. As our Courts have previously addressed the merits of interlocutory appeals concerning a putative father's consent to adoption, we see no reason not to afford the birth mother the same protection. *See In re Adoption of Anderson*, 165 N.C. App. 413, 598 S.E.2d 638, 639 (2004), *rev'd on other grounds*, 360 N.C. 271, 624 S.E.2d 626 (2006); *In re Byrd*, 137 N.C. App. 623, 529 S.E.2d 465 (2000), *aff'd sub nom.*, 354 N.C. 188, 552 S.E.2d 142 (2001).

## III. <u>Analysis</u>

The primary issue presented on appeal is whether the birth mother's consent to relinquish her parental rights to the Agency was valid. Petitioners argue that the trial court erred in voiding the relinquishment on the basis that the birth mother

did not execute it while "under oath" as mandated by N.C. Gen. Stat. § 48-3-702. We agree.

We note that petitioners did not assign error to any of the trial court's findings of fact. As such, all of the trial court's findings of fact are deemed conclusive on appeal. *Fakhoury v. Fakhoury*, 171 N.C. App. 104, 108, 613 S.E.2d 729, 732 (2005). We review the trial court's conclusions of law *de novo*. *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 502 (2010).

The laws governing adoptions in North Carolina are creatures of statutory construction as set forth in Chapter 48 of our general statutes. Our legislature requires that Chapter 48 "be liberally construed and applied to promote its underlying purposes and policies." N.C. Gen. Stat. § 48-1-100(d) (2013). "[T]he needs, interests, and rights of minor adoptees are primary. Any conflict between the interests of a minor adoptee and those of an adult shall be resolved in favor of the minor." N.C. Gen. Stat. § 48-1-100(c) (2013). Here, the trial court relied on N.C. Gen. Stat. § 48-3-702(a) in voiding the birth mother's relinquishment. The statute provides that "[a] relinquishment executed by a parent or guardian must **conform substantially** to the requirements in this Part **and** must be

**signed and acknowledged under oath** before an individual authorized to administer oaths or take acknowledgments." N.C. Gen. Stat. 48-3-702(a) (2013).

This is not a case where the birth mother argues that her consent to relinquish Baby Boy was not given knowingly and voluntarily. In fact, the birth mother admits that she signed her relinquishment before a notary public, that she knew what she was signing, and the consequences, that she signed knowing the time limits for revocation, and that she contacted Ms. Walston to confirm that it was her last day to revoke prior to the expiration of the seven-day period. Further, the birth mother admits that Ms. Walston asked her a series of questions, which she answered truthfully before the notary. In "the absence of evidence of fraud on the part of the notary, or evidence of a knowing and deliberate violation," we recognize a presumption of regularity to notarial acts. N.C. Gen. Stat. § 10B-99 (2013). This presumption of regularity allows notarial acts to be upheld, "provided there has been substantial compliance with the law." N.C. Gen. Stat. § 10B-99. Thus, the presumption of regularity acts to impute a "substantial compliance" component to notarial acts, including the administration of oaths.

We turn now to the pertinent issue before us—whether the birth mother was under oath when she signed her relinquishment. *See* N.C. Gen. Stat. § 48-3-702(a). Our Supreme Court has maintained that statutes should be read and understood according to the natural and most obvious import of the language without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. *State v. Carpenter*, 173 N.C. 767, 92 S.E. 373, 374 (1917). "If the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning[.] . . . This is especially true in the context of adoption, which is purely a creation of statute." *Boseman* at 545, 704 S.E.2d at 500 (citations and quotation marks omitted).

We read N.C. Gen. Stat. 48-3-702(a) to require both (1) substantial performance of the requirements set out in Chapter 48, and (2) that the relinquishment must be signed and acknowledged under oath before an individual authorized to administer oaths or take acknowledgments. From its plain language, we hold that the legislature intended for the "substantial compliance" component of N.C. Gen. Stat. 48-3-702(a) to apply only to the requirements set out in Chapter 48.

There is no "substantial compliance" component concerning the oath requirement on the face of N.C. Gen. Stat. 48-3-702(a).

An oath is administered to a document signer (the principal) when the principal is required to make a sworn statement about certain facts. An oath is defined as:

> A notarial act which is legally equivalent to an affirmation and in which a notary certifies that at a single time and place all of the following occurred:
>
> a. An individual appeared in person before the notary.
>
> b. The individual was personally known to the notary or identified by the notary through satisfactory evidence.
>
> c. The individual made a vow of truthfulness on penalty of perjury while invoking a deity or using any form of the word "swear."

N.C. Gen. Stat. § 10B-3(14) (2013).

An acknowledgment is a notarial act that occurs when a notary certifies that at a single time and place:

> a. An individual appeared in person before the notary and presented a record.
>
> b. The individual was personally known to the notary or identified by the notary through satisfactory evidence.
>
> c. The individual did either of the following:
> i. Indicated to the notary that the signature on the record was the individual's signature.

> ii. Signed the record while in the physical presence of the notary and while being personally observed signing the record by the notary.

N.C. Gen. Stat. § 10B-3(1) (2013). There is no oath requirement for an acknowledgment. When an oath is administered in conjunction with a principal's signing, the notarization functions as a verification or proof, not an acknowledgment. N.C. Gen. Stat. § 10B-3(28).

## A. Notary to Administer an Oath

In the instant case, there is no real issue about the Agency's compliance with subparagraphs (a) and (b) of N.C. Gen. Stat. § 10B-3(14). However, the trial court found that subparagraph (c) was not satisfied, in part, because Ms. Durbin "did not put [the birth mother] under oath before or after signing the relinquishment forms[.]" By the trial court's reasoning, the notary or certifying officer is the only individual with authority to administer an oath to a document signor. Again, we disagree.

Initially, we would like to discuss the role of a notary when administering oaths and affirmations, particularly given that the case law on this topic is fairly sparse. It is the primary function of a notary to serve as an impartial witness

when authenticating legal documents and administering oaths or affirmations. A notarization that requires the signor to be placed under oath begins with the administration of an oath or affirmation. A traditional jurat notarization recites that a document has been "subscribed and sworn to" before a notary. BLACK'S LAW DICTIONARY 866 (8th ed. 2004). By its administration, an oath or affirmation gives weight to the truthfulness of the document's substance. The failure to administer an oath or affirmation as required may result in a defective notarization. Should this occur, the document bearing the defective notarization may be invalidated and the underlying transaction voided. The "consequence of the failure of notaries to [] administer such oaths or affirmations constitutes a disservice to document signers, to the third parties who rely upon notarized signatures, and to the office of notary public." Michael L. Closen, *To Swear . . . or Not to Swear Document Signers: The Default of Notaries Public and A Proposal to Abolish Oral Notarial Oaths*, 50 Buff. L. Rev. 613, 617 (2002). Accordingly, we cannot stress enough the seriousness of properly administering oaths and affirmations, and we urge notaries to be diligent in performing this duty.

Neither statutory nor common law clearly sets forth the formalities of oath administration. For example, North Carolina's "oath" statute, N.C. Gen. Stat. § 10B-3(14), does not specifically require that the notary orally administer the oath. By its plain language, the notary need only certify that the notary witnessed the signor make a vow of truthfulness by using any form of the word "swear." In fact, none of our notarial statutes specify by their plain language that the notary is required to administer an oral oath to the principal prior to notarization. Nevertheless, the trial court in the instant case voided the birth mother's relinquishment on this basis.

The case law pertaining to this issue supports an alternative outcome. First, we look to *State v. Knight*, an early North Carolina Supreme Court case, for the proposition that a notary (or other authorized individual) may delegate the administration of an oath to a third party who is not vested with authority to administer oaths. 84 N.C. 789 (1881). In *Knight*, the Martin County coroner, J.H. Ellison, had sole authority to administer an oath to certain witnesses. However, he allowed justice of the peace, J.L. Ewell, to place the witnesses under oath in his presence and before the court. *Id.* at 791-92. The defendant moved to arrest judgment on grounds

that the witnesses were not properly administered the oath.  Our Supreme Court disagreed on the basis that it "sufficiently appear[ed] that the administration of the oath was the act of the coroner."  *Id*. at 793. Our Supreme Court concluded that the administration of an oath is a ministerial act and it

> may be administered by any one [sic] in the presence and by the direction of the court[.]  . . . It was just as competent for the coroner to have called upon any unofficial bystander to administer the oath for him, as upon a justice of the peace.  It was therefore immaterial whether in this case the justice had the authority to administer the oath or not.

*Id*.

Relying in part on *Knight*, the Alabama Supreme Court addressed a similar issue in *Walker v. State*, 107 Ala. 5, 18 So. 393 (1895).  In *Walker*, the defendant was prosecuted for perjury after making a false affidavit attesting to a certain conveyance of land.  In executing the affidavit, Elbert Holt, a deputy clerk without authority to administer an oath, "in point of actual, physical fact, administered the oath to the defendant[.]"  *Id*. at 9, 18 So. at 394.  The Alabama Supreme Court held that Elbert Holt's administration satisfied the oath requirement because E.R. Holt, the clerk with authority, "was present at the time, knew what was going on, and directed or

-18-

assented to the administering of the oath, which was done in his name as such clerk, and the evidence of which—the jurat—was made out and stands in his name[.]"  *Id*. at 9-10, 18 So at 394.   The Alabama Supreme Court opined:

> [T]his actual administration by Elbert Holt was, under the circumstances, in legal contemplation the official act of E.R. Holt, the de jure clerk of the court, is fully settled by the authorities (*State v. Knight*, 84 N.C. 789, 793; *Stephens v. State*, 1 Swan, 157; *Oaks v. Rodgers*, 48 Cal. 197); and this upon the general principle that a ministerial act done by one under the authority, and by the direction, or with the knowledge and assent, and especially in the presence, of an officer duly authorized to perform that act, is the act of the officer himself.

*Id*. at 10, 18 So. at 394.

More recently, in *Gargan v. State*, 805 P.2d 998 (Alaska App. 1991), the Alaska Court of Appeals considered an argument similar to the one advanced by the birth mother in the instant case.  *Gargan* concerned the defendant's perjury conviction involving an affidavit that purported on its face to be sworn before a notary.  Evidence at trial established that the notary had not actually administered an oath prior to notarizing the affidavit.  *Id*. at 1004.  Nevertheless, the trial judge allowed the jurors to consider the statement during their deliberations.

The Alaska Court opined that the crucial issue was not whether an oath was actually administered, but whether the signed statement constituted "a verification on its face of the truthfulness of the facts contained therein."[1]  *Id*. at 1005.  The Alaska Court concluded that the document satisfied the substantial requirements of a verification given that the defendant: (1) was properly identified, (2) knowingly signed the document in the notary's presence, (3) the document contained the language "duly sworn," and (4) the notary actually notarized the document.  *Id*.  As such, the Alaska Court held that the oath requirement was satisfied upon notarization.  *Id*.

We find *Gargan* noteworthy for the proposition that an oath is considered administered when an individual signs a document in a notary's presence that contains the language "duly sworn" or its equivalent.  The Alaska Court essentially held that the "duly sworn" language in a document is equivalent to the delivery of a verbal oath, provided certain other factors are satisfied.  In the instant case, respondents advance the same proposition—they contend that because the birth mother (1)

---

[1] A verification is defined as (1) a formal declaration made under oath by the principal swearing to the truthfulness of the statements in a document, or (2) an oath or affirmation that an authorized officer administers to an affiant or deponent, or (3) any act of notarizing.  BLACK'S LAW DICTIONARY 1593 (8th ed. 2004).

knowingly signed the document in the notary's presence, (2) the document contained the language "duly sworn," and (3) the notary verified the swearing, the "oath was administered by the certifying official at the time [the birth mother] signed the relinquishment." At present we express no opinion on the merits of respondent's argument or the *Gargan* decision, namely because the facts of the case before us show that an oath was administered to the birth mother by Ms. Walston.

On appeal, counsel for the birth mother argues that the notary herself was required to deliver the oath for it to be effective. Counsel reasons: It "is part of the notary's training to know how to administer an oath" and "if we somehow take away the requirement that the notary have to administer an oath, we have negated the entire notarial act. We have taken away something that the notary is required to do." Counsel applies this logic to the notarization of affidavits—arguing that any party who executes an affidavit should be permitted at a later time to withdraw it on the basis that it was not given under oath. Alternately, petitioners argue that an oath was effectively administered when Ms. Walston read the relinquishment to the birth mother stating, "I, Amy Marie Costin being duly sworn, declare . . . [.]"

We agree with petitioners. In the instant case, the birth mother advances a purely technical argument and has failed to present sufficient evidence to overcome the presumption of regularity created in favor of the validity of notarial acts. *See Moore v. Moore*, 108 N.C. App. 656, 658, 424 S.E.2d 673, 674, *aff'd*, 334 N.C. 684, 435 S.E.2d 71 (1993) (holding that the plaintiff-husband failed to overcome the presumption in favor of the legality of an acknowledgment when it was undisputed that he signed the separation agreement, but advanced the technical argument that the agreement was void because the notary did not witness his signature since she walked "in and out of the conference room"). Here, it is undisputed that the birth mother signed the relinquishment in the notary's presence. The notary testified that she witnessed the birth mother's signature and verified the document. In doing so, the notary attested by her seal that the document was "sworn to (or affirmed) and subscribed" before her. Nothing in the record impeaches her certification, including the notary's testimony that she did not place the birth mother under oath.

The administration of an oath is a ministerial duty and it may be delivered by persons who lack official authority, provided that a certifying officer is present and directs or

assents to the administration. Here, in substance and legal effect, the requirement that the birth mother be placed "under oath" was satisfied when Ms. Walston read the relinquishment to her. The notary was physically present when the oath was administered, aware of the circumstances, and thereby implicitly assented to its administration, which was done in her name. By these facts, it sufficiently appears that the administration of the oath was the act of the notary. *See Knight*, *supra*.

Further, the plain language of N.C. Gen. Stat. § 10B-3(14)(c) requires the principal to make a vow of truthfulness "while invoking a deity or using any form of the word 'swear.'" Again, "any form" of the word "swear" may be utilized—the statute does not mandate that the signor orally repeat the word "swear." Here, the birth mother stated in writing that she had been "duly sworn" when she signed the document. The notary's verification recites that the birth mother had sworn to the document before the notary. Additionally, Ms. Walston read the word "swear" aloud in administering the oath. We hold that N.C. Gen. Stat. § 10B-3(14)(c) was satisfied. Accordingly, we conclude that the trial court erred in entering an order declaring the birth mother's relinquishment void. There was a

valid relinquishment in this matter, which the birth mother failed to timely revoke.

## B. <u>**Statutory Grounds to Void Relinquishment**</u>

As we have held that the relinquishment was not void *ab initio*, the birth mother was limited to challenging her relinquishment on the express grounds established by the legislature to void relinquishments. N.C. Gen. Stat. § 48-3-707. Absent the consent of the parties, the only applicable grounds for voiding the relinquishment in the instant case requires the birth mother to prove by clear and convincing evidence that her relinquishment was obtained by fraud or duress. N.C. Gen. Stat. § 48-3-707(a)(1).

In its order, the trial court concluded: "There was no constructive fraud or actual fraud by the [A]gency in the procurement of the relinquishment." Upon conducting a *de novo* review of the record, we agree. The Agency made every effort to ensure that the birth mother was apprised of the complexity of the situation and the legalities of the adoption process. Ms. Walston testified that she reviewed the relinquishment with the birth mother prior to Baby Boy's birth, she read the relinquishment aloud, and the birth mother was given a copy of the form. Again, this is not a case where the birth mother

-24-

argues that her consent to relinquish Baby Boy was not given knowingly and voluntarily.

**C. <u>Designation of Baby Boy's Sex on Relinquishment Form</u>**

Finally, we recognize that for a relinquishment to be complete, it must disclose the "date of birth or the expected delivery date, the sex, and the name of the minor, if known[.]" N.C. Gen. Stat. 48-3-703. Here, the relinquishment omitted Baby Boy's gender. In Finding #4, the trial court found: "There was no evidence that [the birth mother] requested this omission or why this information was omitted." We disagree. Ms. Walston testified that the birth mother requested a closed adoption and "did not plan to see the child or even want to know the sex of the child[.]" The birth mother testified: "I never wanted an open adoption. . . . We never discussed an open adoption." Accordingly, there is evidence that the Agency omitted the sex of Baby Boy based on what it perceived to be the birth mother's request. Regardless, N.C. Gen. Stat. § 48-3-702(a) provides that a relinquishment only needs to be executed in substantial compliance with the law, and this was accomplished.

## IV. <u>Conclusion</u>

In sum, the trial court erred in entering an order voiding the birth mother's relinquishment. The relinquishment is valid

and conforms to the mandatory statutory requirements as set out in N.C. Gen. Stat. § 48-3-702. Accordingly, we reverse the trial court's order.

Reversed.

Judges McGEE and HUNTER, Robert C., concur.